## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Jamal Stephenson,** *et al.,* | **Case No. 1:18cv2017** |
| **On behalf of himself and** | |
| **All others similarly situated,** | |
| | |
| **Plaintiffs,** | **JUDGE PAMELA A. BARKER** |
| | |
| -vs- | |
| | |
| **Family Solutions of Ohio, Inc.,** | **MEMORANDUM OPINION AND** |
| *et al*., | **ORDER** |
| | |
| **Defendants** | |

Currently pending is Defendants Family Solutions of Ohio, Inc., Prostar Management, Inc., John Hopkins, and Dawn Smith's *Daubert* Motion to Exclude the Testimony of Plaintiffs' Expert. (Doc. No. 183.)  Plaintiffs filed a Brief in Opposition on June 16, 2022, to which Defendants replied on June 23, 2022.  (Doc. Nos. 185, 189.)  For the following reasons, Defendants' Motion (Doc. No. 183) is DENIED.

## I.    Relevant Factual Background

Defendant Family Solutions of Ohio, Inc. ("Family Solutions") is a non-profit organization that provides mental and behavioral healthcare services for children and families throughout Ohio. (Decl. of Dawn Smith dated June 2, 2022 (Doc. 183-2) at ¶¶ 3, 7.)  Defendant Dawn Smith ("Smith") was highly involved in the development of Family Solutions and currently serves as its Vice President of Strategic Planning and Program Management.  (*Id*. at ¶¶ 1, 3.)

During the Class Period, Family Solutions had locations in Cleveland, Bedford Heights, Lorain, Columbus, and Cincinnati.[1]  (*Id*. at ¶ 10.)  At each location, Family Solutions employs a Program Director or Assistant Program Director, as well as a Clinical Supervisor.  (*Id*. at ¶ 11.)  The Program Director/Assistant Program Director and Clinical Supervisor oversee employees based out of that site that work with patients in the field.  (*Id*. at ¶ 12.)  Each site's Clinical Supervisor is the direct supervisor of certain employees based out of that particular site.  (*Id*.)

Qualified Mental Health Specialists[2] ("QMHSs") are one of the categories of employees at Family Solutions that work with patients in the field.  (Decl. of Dawn Smith dated Aug. 31, 2020 (Doc. No. 138-1) at ¶ 7.)  *See also* Deposition of Jamal Stephenson (Doc. No. 115-1) at Tr. 78; Deposition of Melanie Baron (Doc. No. 113-1) at Tr. 18-19.  The parties dispute the precise scope and nature of the QMHSs' job duties.  However, in general terms, the parties agree that QMHSs provide behavioral health services, including counseling services, to Family Solutions' Medicaid-eligible patients.  (Smith Decl. dated Sept. 1, 2020 (Doc. No. 89-1) at ¶¶ 26, 29.)  The parties also agree that, as part of their duties, QMHSs schedule appointments with clients and visit them at various locations, including in schools and homes.  (Stephenson Depo. at Tr. 78; Baron Depo. at Tr. 18-19.)  Because they visit clients in the field, virtually all QMHSs travel between clients during the course of the workday.  (Smith Depo. (Doc. No. 114-1) at Tr. 262-263.)  In addition, it is undisputed that QMHSs are required to create progress notes regarding their clients and enter documentation into

---

[1] According to Defendant Smith, the Cleveland Office is now closed. (*Id*. at ¶ 6.) In addition, although Family Solutions does not have an Akron location, it "has been offering services to patients located in Akron."  (*Id*.)

[2] This position is currently referred to as "Qualified Behavioral Health Specialists."  (Decl. of Dawn Smith dated Aug. 31, 2020 (Doc. No. 138-1) at ¶ 7.)  For purposes of this Opinion, the Court will refer to the position as it was known when it was held by Plaintiffs Baron and Stephenson, i.e., as Qualified Mental Health Specialists.

their client's files using the "ICANotes" electronic medical record system.  *See* Smith Depo. at Tr. 262-263.

Representative Plaintiffs Melanie Vilk Baron ("Baron") and Jamal Stephenson ("Stephenson") were QMHSs.  (Baron Depo. at Tr. 6; Stephenson Depo. at Tr. 117-125.)  Baron worked in Family Solutions' Cleveland location between August 1, 2016 and October 7, 2016.  (Doc. No. 183-2 at ¶ 60.)  *See also* Baron Depo. at Tr. 5, 12.  According to Defendants, Baron was still in her probationary period at the time she resigned from Family Solutions.  (Doc. No. 183-2 at ¶ 60.)  Stephenson worked in Family Solutions' Cincinnati location from August 2016 to May 2017.  (*Id.* at ¶ 56.)

Hourly employees (such as QMHSs) are trained at the site-level by each site's employees.  (Doc. No. 183-2 at ¶ 27.)  When first hired, QMHSs attend an orientation session that is conducted by salaried employees at their respective sites.  (*Id.* at ¶ 28.)  Specifically, the site's Program Director or Assistant Program Director and the site's Clinical Supervisor explain time reporting and methods of pay during orientation.  (*Id.*)  In addition, the Program Director, Assistant Program Director, and/or Clinical Supervisor work individually with each employee to provide training regarding how hourly employees are required to report their time.  (*Id.* ¶¶ 31, 32.)  Among other things, employees who are paid hourly are instructed that they must follow Family Solutions' Reporting Time Worked policy, which provides (in relevant part) that: "Accurate recording of time worked and absence from work is the responsibility of every employee. All employees must complete and sign a time sheet that is signed by their immediate supervisor."  (*Id.* at ¶ 29.)

Both Baron and Stephenson confirmed during deposition that, as QMHSs, they were required to submit weekly time sheets.  (Baron Depo. at Tr. 27, 37; Stephenson Depo. at Tr. 143, 145.)

Clinical Supervisors then reviewed the QMHSs' time entries for accuracy and compliance with Family Solutions' policies.  (Doc. No. 183-2 at ¶ 33.)  As part of this review, the time inputted by the QMHS was assigned a code pursuant to Family Solutions' Medicaid fee schedule.  (Doc. No. 89-1 at ¶ 23.)  Family Solutions' fee schedule also includes entries for time spent on non-billable matters. (*Id.* at ¶ 25.)  *See also* Baron Depo. at Tr. 31-32.

Representative Plaintiffs Baron and Stephenson testified that they were paid for whatever time they put on their time sheets.  *See* Baron Depo. at Tr. 41; Stephenson Depo. at Tr. 148.  Baron and Stephenson testified, however, that QMHSs were not paid for certain categories of time for which there was no corresponding Medicaid billing code.  Specifically, Baron and Stephenson testified that they were not paid for time spent (1) traveling between clients; (2) entering documentation into clients' electronic health records; and (3) dealing with no-show appointments.  *See* Baron Depo. at Tr. 64-65; Stephenson Depo. at Tr. 39, 52-53, 135-137.

Rose Marie Pryor, Julie Winston, Sereena Creamer, and Valerie White (each of whom were employed as Clinical Supervisors at different Family Solutions office locations) submitted Declarations in this action.[3]  (Doc. No. 186-2 at PageID#s 7841-7852.)  Therein, Pryor, Winston, Creamer and White aver that one of their jobs was to evaluate and approve or deny time logged by QMHSs on billing and time sheets.  (*Id.*)  They each state that, throughout their tenures with Family Solutions, "the company had a uniform policy for timekeeping and compensation of . . . hourly QMHSs with respect to time spent writing and reviewing client notes and documentation, on work-

---

[3] Pryor was employed as a Clinical Supervisor in Family Solutions' Cincinnati office.  (Doc. No. 186-2 at PageID# 7841.)  Winston was employed by Family Solutions as a Clinical Supervisor in Akron.  (*Id.* at PageID# 7844.)  Creamer was employed as Clinical Supervisors in both Bedford Heights and Akron.  (*Id.* at PageID# 7847.)  Lastly, White was employed as a Clinical Supervisor in both the Cleveland Columbus offices.  (*Id.* at PageID# 7850.)

4

related travel, or for waiting and notating files regarding client no-shows." (*Id.*)  Specifically, Pryor, Winston, Creamer, and White aver that they were each instructed not to approve time logged by QMHSs for any of these activities.  (*Id.*)  In addition, Winston, Creamer, and White state that "[m]any hourly employees at Family Solutions complained to [them] about not getting paid for writing and reviewing client notes and documentation, work-related travel time, and no-shows." (*Id.*)  Winston, Creamer, and White further aver that they discussed these employees' complaints with various Program Directors and Training Coordinators,[4] but nothing was done (to their knowledge) to rectify these complaints.  (*Id.*)

## II.  Relevant Procedural Background

### A.  Initial Pleadings and FLSA Conditional Certification

On September 4, 2018, Plaintiff Alicia Arends filed a Complaint in this Court on behalf of herself and all others similarly situated against Defendants Family Solutions of Ohio, Inc., Prostar Management, Inc., John Hopkins, and Dawn Smith (hereinafter "Defendants").  (Doc. No. 1.) Therein, Plaintiff asserted that she and the putative class members were employed by Defendants as QMHSs and that Defendants had failed to pay them for time worked that was not billable to Medicaid or other health insurance.  (*Id.*)  Plaintiff alleged the following six claims for relief:  (1) violations of the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) (Count One); (2) violations of the Ohio Fair Minimum Wage Amendment ("OFMWA"), Ohio Constitution, Art. II, § 34a (Count Two); (3) violations of Ohio's overtime compensation statute, Ohio Rev. Code § 4111.03 (Count Three); (4) violations of the OFMWA's record-keeping

---

[4] Specifically, Winston, Creamer and White state that they discussed such employee complaints with Cleveland Program Director Tameka Huey-Barkley, Director Erika Thomas, Training Coordinator Cherelle Scott, and/or Program Director Deanna Robinson.  (Doc. No. 186-2 at PageID#s 7841-7852.)

requirement (Count Four); (5) breach of contract (Count Five); and (6) unjust enrichment (Count Six).  (*Id*.)  Plaintiff sought conditional certification as a FLSA collective action; certification of the state law claims under Fed. R. Civ. P. 23; compensatory and punitive damages; and attorney fees and costs.  (*Id.*)  Jamal Stephenson subsequently filed an Opt-In and Consent Form.  (Doc. No. 12-1.)

On February 28, 2019, Plaintiffs filed a Motion for Conditional Certification and Court-Authorized Notice with respect to their FLSA claims.  (Doc. No. 11.)  Therein, Plaintiffs argued that Defendants violated the overtime provisions of the FLSA by failing to pay potential class members for documentation time, intra-day travel between clients, and time spent for client appointments and no-shows.  (*Id.*)  On September 16, 2019, the Court issued a Memorandum Opinion & Order granting Plaintiffs' Motion for Conditional Certification with respect to all current and former employees who worked as QMHSs between September 16, 2016 and September 16, 2019.  (Doc. No. 20.)

On May 5, 2020, Plaintiffs filed an Amended Class and Collective Action Complaint, designating Plaintiffs Stephenson and Baron as the representative plaintiffs. (Doc. No. 50.)  The Amended Complaint raises the same factual and class allegations and asserts the same six grounds for relief set forth in the original Complaint.  (*Id*.)  Defendants filed an Answer on May 19, 2020. (Doc. No. 51.)  Plaintiffs then filed their Motion for Rule 23 Class Certification on July 31, 2020 and Defendants filed Motions for Summary Judgment with respect to all claims asserted by Plaintiffs Baron and Stephenson on September 1, 2020.  (Doc. Nos. 70, 88, 89.)

**B.**     **Damages Expert Dr. Shane Thompson**

Shortly thereafter, on September 30, 2020, Plaintiffs produced the report of their damages expert, forensic labor economist Shane Thompson, Ph.D.   (Doc. No. 183-2 at PageID#s 7341-7350.) Therein, Dr. Thompson concluded that, between September 4, 2015 and September 29, 2019, twenty-

three (23) Opt-Ins[5] accrued a total of 16,965 hours of unpaid work derived from the following three activities: "(1) documentation time in clients' electronic health records, (2) travel time intraday from client to client, and (3) time spent on no-show appointments."  (*Id.* at PageID# 7342.)  Using the hourly rates and unpaid hours specific to each of the 23 Opt-Ins, Dr. Thompson calculated the total value of unpaid wages to be $472,591.00.  (*Id.* at PageID# 7346.)

On October 7, 2020, Dr. Thompson supplemented his Expert Report based on newly submitted information relating to several Opt-Ins.  (*Id.* at PageID#s 7338-7340.)  Therein, Dr. Thompson revised his Opinion to find that the 23 Opt-Ins had a total of 18,055.6 hours of unpaid work derived from these same three activities.  (*Id.*)  Dr. Thompson calculated the total value of unpaid wages for the 23 Opt-Ins to be $496, 248.27.  (*Id.*)

Plaintiffs' counsel produced Dr. Thompson's "expert file" to Defendants on November 23, 2020.  Several months later, Plaintiffs supplemented Dr. Thompson's expert file with fourteen (14) Declarations of certain Opt-Ins.  (Doc. No. 153-1 at PageID#s 6683-6710.)  In these Declarations, the Opt-Ins estimated (1) the percentage of his/her appointments that involved travel; (2) the average amount of unpaid time spent traveling between consecutive appointments; and (3) the average of unpaid hours per week that he/she spent "scheduling, traveling to/from, and waiting for no-show appointments."  (*Id.*)  Plaintiffs later explained that the information contained in these Declarations

---

[5] Although the docket indicates a total of twenty-seven (27) Plaintiffs and Opt-Ins in the FLSA Collective Class (*see* Doc. Nos. 12, 26-36, 130), Dr. Thompson's report only calculates damages as to twenty-three (23) of these Plaintiffs. Specifically, although they opted in to the FLSA Collective class, Dr. Thompson did not calculate damages for the following Opt-Ins: (1) Cocaina Hereford, (2) Latwana Wright, (3) Olga Diaz, and (4) Valerie Wright.  At least one of these individuals (Latwana Wright) submitted a sworn Declaration estimating her travel and no-show time.  (Doc. No. 186-3 at PageID# 7871-7872.)  It is not clear why these individuals are not addressed in Dr.  Thompson's September and/or October 2020 Reports. Neither party addresses this discrepancy in their briefing.

was not "new" but, rather, a memorialization in affidavit form of the same information that had previously been provided to Dr. Thompson.

### C. Court Rulings on Summary Judgment, Rule 23 Certification, and Motions for Interlocutory Appeal, Sanctions, and Discovery of Absent Class Members

The Court conducted a telephonic status conference with lead counsel on January 8, 2021. At that time, counsel for Plaintiffs specifically asked the Court not to rule on Plaintiffs' Motion for Rule 23 Certification until after a ruling on the pending summary judgment motions. Defendants did not object. *See* Non-Document Order dated January 8, 2021. In addition, counsel for both parties sought, and the Court granted, an indefinite stay of expert discovery. *Id.*

On March 2, 2021, the Court issued a Memorandum Opinion & Order in which it denied Defendants' Motions for Summary Judgment as to Plaintiff Baron's and Stephenson's FLSA and state law wage-and-hour claims. (Doc. No. 137.) Among other things, the Court rejected Defendants' argument that they were entitled to summary judgment in their favor on the issue of damages. (*Id*. at pp. 35-41.) The Court first found that Plaintiffs had come forward with sufficient evidence to create a genuine issue of material fact regarding the issue of whether they suffered damages as a result of Defendants' failure to pay for time spent traveling, entering documentation into clients' health records, and dealing with no-show appointments. (*Id*.) With regard to the specific amount of Plaintiffs' damages, the Court found that Plaintiffs had not failed to timely produce estimates and/or evidence of their damages, finding that "[a]ny delay in producing this information appears to be the result, at least in part, of the Defendants' delay in producing Family Solutions' audit logs and progress notes." (*Id.* at pp. 39-40.) The Court went on to find that, in light of the fact that expert discovery had not yet concluded, Defendants' argument that they were entitled to judgment in their favor with respect to the issue of damages was premature. (*Id*.) The Court, therefore, denied Defendants'

8

Motion for Summary Judgment with respect to the issue of damages without prejudice subject to refiling after the close of expert discovery.  (*Id*.)

On April 5, 2021, the Court issued a Memorandum Opinion & Order granting in part and denying in part Plaintiffs' Motion for Rule 23 Certification of a state law class. (Doc. No. 143.)  The Court granted Plaintiffs' Motion to the extent it sought certification of the following Rule 23 class: "All employees who worked in Ohio as QMHSs for Family Solutions during the period three years preceding the commencement of this action to the present."  (*Id*.)  The Court denied Plaintiffs' Motion, however, to the extent it included hourly Therapists in the state-law class, and a class-action breach of contract claim.  (*Id*.)   Shortly thereafter, the Court conducted a status conference with counsel, at which time it set case management deadlines relating to the Rule 23 class members, including deadlines for the submission of a joint proposed Notice, completion of representative fact discovery, completion of expert discovery, and submission of motions based on the same.  (Doc. No. 145.)

On April 19, 2021, Defendants filed a Notice of Interlocutory Appeal to the Sixth Circuit from this Court's Rule 23 Certification decision.  (Doc. No. 147.)  Defendants thereafter filed, in this Court, a Motion for Certification to File Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b).  (Doc. No. 159.)   Defendants also filed a Motion for Sanctions, arguing that Plaintiffs' failure to provide evidence of damages and timely supplement expert discovery violated Fed. Rules of Civ. Proc. 26 and 33.  (Doc. No. 153.)  Lastly, on February 4, 2022, Defendants filed a Motion to Compel Discovery

of Absent Class Members.  (Doc. No. 174.)  Plaintiffs opposed Defendants' Motions.[6]  (Doc. Nos. 154, 160, 176.)

In a series of Memorandum Opinions & Orders issued in January and February 2022, this Court denied each of Defendants' Motions.  (Doc. Nos. 172, 175, 178.)  The Sixth Circuit Court of Appeals subsequently denied Defendants' Petition for Interlocutory Appeal.  (Doc. No. 188.)  *See also In re Family Solutions of Ohio, Inc*., 2022 WL 13915151 (6th Cir. June 17, 2022).

### D. Dr. Thompson's Supplemental Expert Report

The Rule 23 Class consists of 178 Class Members.  On March 23, 2022, Dr. Thompson supplemented his Expert Report to calculate damages for the Rule 23 Class Members with respect to unpaid work derived from documentation time, travel time, and time spent dealing with no-show appointments from September 2015 to March 18, 2022.  (Doc. No. 183-2 at PageID#s 7353-7365.) Extrapolating the data that he had for the 23 FLSA Opt-Ins to the 178 Rule 23 Class Members, Dr. Thompson found that the Rule 23 Class members suffered $5,616,114 in damages for unpaid wages relating to these three categories of work.  (*Id*.)  In total, then, Dr. Thompson calculated that the 23 FLSA Opt-Ins and 178 Rule 23 Class Members suffered $6,112,362 in damages.  (*Id*.)  Dr. Thompson further opined that, applying certain "conservative reductions" in the amount of hours spent by the 178 Rule 23 Class Members in Travel Time and No-Shows would reduce the total unpaid wages variously to $4,747, 896 (i.e., 2/3 of the original travel/no-show hours); $3,300,174 (i.e., 1/3 of the

---

[6] While Defendants' Motion for Sanctions and Motion for Certification to file Interlocutory Appeal were pending, the parties filed a Joint Motion for Referral to Mediation and to Extend Deadlines.  (Doc. No. 165.)  The Court granted the Motion, referred the matter to Magistrate Judge William Baughman for mediation proceedings, and extended the remaining case management deadlines.  After conducting mediation sessions on November 9, 2021 and December 13, 2021, the Magistrate Judge reported that the parties were unable to reach a resolution.

original travel/no-show hours); and $2,395,682 (i.e., assuming zero unpaid wages due to travel time and no-show appointments).  (*Id*.)

On June 2, 2022, Defendants filed the instant Motion to Exclude the Testimony of Dr. Thompson.[7] (Doc. No. 183.) Plaintiffs filed a Brief in Opposition on June 16, 2022, to which Defendants responded on June 23, 2022.  (Doc. Nos 185, 189.)

## II.    Legal Standard

Federal Rule of Evidence 702 governs the use of expert testimony.  That Rule permits an expert to testify about scientific knowledge if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702. "The same set of questions applies to expert testimony and science-based test results."  *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021).

A district court acts as a gatekeeper to evaluate the admissibility of each potential witness's testimony.  *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993) (assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand).  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (applying the *Daubert* inquiry to non-scientific testimony); *United States v. LaVictor*, 848 F.3d 428, 440-44 (6th Cir. 2017);

---

[7] On that same date, Defendants filed Motions to Decertify the FLSA Conditional Class and the Rule 23 Class.  (Doc. Nos. 181, 182.)  Plaintiffs opposed both Motions, and Defendants filed Reply Briefs.  (Doc. Nos. 186, 187, 190, 191.) Several months later, on December 5, 2022, Defendants filed a Notice of Supplemental Authority to Support their Motion to Decertify the Rule 23 Class and Request for Supplemental Briefing.  (Doc. No. 194.)  Plaintiffs have been ordered to file a response by no later than December 16, 2022.  The Court will address Defendants' Motions to Decertify in separate Memorandum Opinions & Orders.

*Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526-28 (6th Cir. 2014); *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528-32 (6th Cir. 2008); *United States v. Jones*, 107 F.3d 1147, 1150-61 (6th Cir. 1997).   As the Sixth Circuit has explained:

> *Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other. For expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) h[is] testimony to be relevant; and (3) h[is] testimony to be reliable.   There is no 'definitive checklist or test' for striking this balance, but the Supreme Court in *Daubert* did identify four factors that normally bear on the inquiry: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*LaVictor*, 848 F.3d at 441 (citations and internal formatting removed). *See also In re Scrap Metal*, 527 F.3d at 529.

Because "[m]ulti-factor tests . . . run the risk of obscuring the core inquiry," the Sixth Circuit has noted that "[t]he key handholds of Rule 702 thus bear repeating:  To be admissible, any relevant scientific or technical evidence must be the 'product of reliable principles and methods' and must have been 'reliably applied' in the case.  That is what matters most." *Gissantaner*, 990 F.3d at 463. The test of reliability is "flexible" and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case.  *In re Scrap Metal*, 527 F.3d at 529 (citing *Kumho*, 526 U.S. at 150).  Indeed, the Sixth Circuit has recognized that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001).  *See also In re Scrap Metal*, 527 F.3d at 529.

"The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof." *United States v. Lang*, 717 Fed. Appx. 523, 534 (6th Cir. 2017) (citing *Daubert,* 509 U.S. at 596.) Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  *See In re Scrap Metal*, 527 F.3d at 529-530 ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.")  Thus, as in all cases, a jury is free to disbelieve expert testimony that it finds to be flawed.  *Lang,* 717 Fed. Appx. at 534.  *See also United States v. Conatser*, 514 F.3d 508, 518–19 (6th Cir. 2008).

## III.    Analysis

Defendants argue that Dr. Thompson should not be permitted to testify because his expert opinions do not satisfy the requirements of Fed. R. Evid. 702. (Doc. No. 183.)  While they do not dispute that Dr Thompson is qualified to serve as an expert, Defendants maintain that his testimony should be excluded because he "did not follow a proper method in reaching his opinion" in this particular case.  (*Id*. at pp. 1-2, 7.)  Specifically, Defendants assert that Dr. Thompson "did not apply his own expertise or standards in developing his report" and, instead, relied solely on counsel's recommendations with respect to both the categories of damages and the manner of calculating the amount of damages.  (*Id*. at p. 7.)  Defendants further argue that Dr. Thompson's expert opinions are unreliable because he failed to interview any class member, did not question any of the witness statements (which were obtained by counsel), did not "investigate any of the class members at issue," and "did not question any of the calculations."  (*Id*.)  Lastly, Defendants assert that Dr. Thompson's

"only value to the report was very basic math" which does not require any particular expertise and, therefore, would not be helpful to the jury. (*Id*. at pp. 7-8.)

In response, Plaintiffs emphasize that Dr. Thompson had no choice but to estimate damages in this case because Defendants failed to keep records of employees' time or to produce certain documents in discovery that would have assisted him in calculating time spent in the three categories at issue. (Doc. No. 185 at p. 1.) Plaintiffs argue that, in the absence of such records, Dr. Thompson properly relied on audit logs, billing sheets, witness statements, and polling data to arrive at his damages estimates. (*Id.* at p. 4-6.) Plaintiffs maintain that Dr. Thompson used reliable principles and methods in calculating damages, both for the 23 Opt-Ins and the 178 Rule 23 Class Members. (*Id*. at pp. 7-14.) They assert that, rather than simply using "basic math," Dr. Thompson used his expertise as a statistician "at every level of analysis," including in extracting data from the audit logs, cross-checking the Opt-Ins' witness statements against the billing records, weighting his average calculations for "the most accurate representations," and extrapolating his calculations from the 23 Opt-Ins to the larger Rule 23 Class. (*Id*. at pp. 8-9.) Plaintiffs assert that Dr. Thompson did not err in relying on counsel's identification of the three categories of damages or failing to interview each Opt-In because doing so was not necessary for purposes of his expert opinion. (*Id*.) Lastly, Plaintiffs argue that, even if Dr. Thompson does not qualify as an expert under Rule 702, he may nonetheless testify as a "summary witness under Rule 1006 to present damages calculations from data." (*Id*. at pp. 14-15.)

### A. Dr. Thompson's Expert Reports

Before addressing the parties' specific arguments, the Court must first summarize, in some detail, Dr. Thompson's Expert Reports. In his September 2020 Expert Report, Dr. Thompson

14

evaluated the number of hours of unpaid work for the 23 Opt-Ins with respect to the following three activities: (1) documentation time in clients' electronic health records, (2) travel time intraday from client to client, and (3) time spent on no-show appointments.  (*Id.* at PageID# 7342.)  Dr. Thompson's calculations covered the time period between September 4, 2015 through September 29, 2019.  (*Id.*)

With regard to the first of these categories, Dr. Thompson explained that "Plaintiffs used an electronic medical records system that tracked their documentation activities."  (*Id.* at PageID# 7343.) Dr. Thompson used the audit logs maintained and provided by Defendants' electronic medical record vendor "showing time spent on documentation for each Plaintiff," with the exception of two Opt-Ins (Kimberly Bolden and Maria Graciani) for whom he did not have audit logs.  (*Id.* at PageID# 7338.) Dr. Thompson calculated the time spent on documentation activities using the "following logic:"

    a.      Sort each Employee's activities by day and time.

    b.      Calculate the elapsed time between two consecutive activities.

    c.      Delete elapsed time between two activities if the second of the two consecutive activities is a "login."

    d.      Impute the missing documentation hours for [Opt-Ins] Kimberly Bolden and Maria Graciani using the average weekly documentation hours for the other 21 Plaintiffs.

    e.      Sum elapsed documentation time for each Employee.

(*Id.* at PageID# 7343.)  Based on his review, Dr. Thompson concluded that the 23 Opt-Ins had a total of 6,922 unpaid hours of documentation time.  (*Id.*)

With regard to unpaid hours relating to travel time, Dr. Thompson explained that he had "records on the number of patients seen by Plaintiffs from their respective billing sheets" with respect

to 30% of the "employee weeks;" [8] however, the remaining 70% of employee weeks had "missing data." (*Id*. at PageID#s 7343-7344.) He imputed the "missing data" as follows: (1) he computed the average weekly number of patients for each employee; (2) when an "employee week" had no data on the number of patients, he replaced the missing value for the week with the average weekly value for that employee; and (3) if the employee had no average weekly value, he used the overall average weekly value for all employees. (*Id*.)

Dr. Thompson then explained that "Defendants do not have a system to track the proportion of consecutive appointments that involved travel time between these appointments." (*Id*. at PageID# 7344.) Therefore, he relied on information obtained by counsel from 12 of the 23 Opt-ins regarding (1) the proportion of their consecutive appointments that involved travel, and (2) the average travel time between those consecutive appointments. (*Id*.) Dr. Thompson assumed that the 12 Opt-Ins who supplied information were representative of the 11 Opt-Ins who did not. (*Id*.) He opined that "the average proportion of consecutive appointments that involved travel and average travel time for the 12 Plaintiffs could be used as proxies for the missing data for the 11 Plaintiffs that did not supply information." (*Id*.) Dr. Thompson then needed "the number of daily patients seen to calculate weekly Employee travel hours." (*Id*.) He computed weekly Employee travel hours by (1) computing average daily patients seen as average weekly patients divided by 5; and (2) for each day, calculating $Travel\ Hours_{daily} = \%Consecutive * (AvgDailyPatients - 1)$;[9] and (3) aggregating daily travel hours to

---

[8] Dr. Thompson explained that there were 1,062 employee-weeks in the data provided to him. (*Id*. at PageID# 7344.)

[9] Dr. Thompson explained that he "subtract[ed] one from the average daily patients because the first appointment cannot be the second half of a consecutive appointment. Thus, an Employee that has, say, four average daily appointments can only have a maximum of three consecutive appointments that involved travel time." (*Id*. at PageID#7345.)

the week.  (*Id.* at PageID#s 7344-7345.)  Based on his review, Dr. Thompson concluded that the 23 Opt-Ins had 3,919 total unpaid hours of travel time.  (*Id.* at PageID# 7345.)

Finally, with regard to unpaid hours relating to no-show appointments, Dr. Thompson noted that "Defendants do not have a system to track time spent on no-show appointments" and, therefore, he relied on the information obtained by counsel from 12 of the 23 Opt-Ins.  (*Id.*)  He used the following logic to compute hours spent on no-show appointments: (1) compute the overall average weekly hours on no-show appointments for Employees; and (b) apply the average to Employees that did not provide information.  (*Id.*)  Based on his review, Dr. Thompson concluded that the 23 Opt-Ins had a total of 6,124 total unpaid hours spent in this category. (*Id.*)

Thus, in total, Dr. Thompson found that the 23 Opt-Ins accrued 16,965 hours of unpaid work (i.e., 6,922 unpaid hours of documentation time + 3,919 hours of unpaid travel time + 6,124 hours of unpaid hours spent on no-show appointments.)  Of these total hours of unpaid work, Dr. Thompson concluded that 11,351 hours consisted of unpaid regular-rate hours and 5,614 hours consisted of unpaid overtime hours.  (*Id.* at PageID#s 7345-7346.)  Using the hourly rates and unpaid hours specific to each of the 23 Opt-Ins, Dr. Thompson found that the total value of unpaid wages for these FLSA Plaintiffs was $472,591.  (*Id.*)

On October 7, 2020, Dr. Thompson supplemented his Expert Report with a Declaration and two Revised Tables. (Doc. No. 183-2 at PageID#s 7338-7340.)  In his Declaration, Dr. Thompson explained that "[s]ince issuing my September 30, 2020 report, I have received and reviewed audit logs for [Opt-Ins] Maria Graciani and Kimberly Bolden, as well as declarations of [Opt-Ins] Alex Dolin, Anjelica Morris, and Jamal Stephenson."  (*Id.*)  Dr. Thompson stated that he incorporated the information contained in this new material into two Revised Tables, which set forth new calculations

17

with respect to unpaid hours and unpaid wages for the 23 Opt-Ins.  (*Id*.)  Using the same methodology described in his September 2020 Report, Dr. Thompson now calculated that the 23 Opt-Ins had 7,485.6 hours of unpaid documentation time; 3,516 hours of unpaid travel time; and 7,054.0 hours of unpaid no-show time, for a total of 18,055.6 hours of unpaid time.  (*Id*.)  Dr. Thompson found that the total value of unpaid wages for these Opt-Ins was $496,248.27.  (*Id*.)

Dr. Thompson again supplemented his expert report after the certification of the Rule 23 Class.  (Doc. No. 183-2 at PageID#s 7353-7365.)  Specifically, on March 23, 2022, Dr. Thompson submitted a Declaration in which he explained that: "At the writing of my previous report, I had data for 23 original plaintiffs and calculated unpaid wages for those 23 employees.  My attached supplemental report incorporates calculations accruing to 201 class members – the 23 original plaintiffs plus 178 additional [Rule 23] class members identified on two Excel files provided by counsel."  (*Id*. at PageID#s 7353.) Dr. Thompson's Supplemental Report covered the time period from September 2015 to March 18, 2022.  (*Id*. at PageID# 7357-7358.)

In his Supplemental Report, Dr. Thompson states that "Defendants did not provide audit log documentation for the additional 178 class members, nor did those members estimate unpaid travel time and no-shows (like the 23 Original Plaintiffs had)."  (*Id*. at PageID# 7357.)  Thus, Dr. Thompson calculated damages for the 178 Rule 23 Class Members based on the data he received for the original 23 Opt-Ins.  (*Id*.)  Dr. Thompson explained his methodology for extrapolating the data from the 23 Opt-Ins to the 178 Rule 23 Class Members, as follows:

> 21. From September 4, 2015 to the present, the 23 Original Plaintiffs accrued an average of $424.70 unpaid wages each week, weighting each Plaintiff equally. [fn omitted] On average, $167.24 accrued from unpaid audit log hours; $86.63 accrued from travel time; and $170.84 came from no-shows.

18

22. I applied this value to the 178 additional Plaintiffs (added since my last report) because I do not have week-by-week data for those new Plaintiffs. These estimates are reasonable for the 178 additional Plaintiffs. The average weekly audit log hours for the 23 Plaintiffs was 6.3 (see Table 1). I calculated a 95% confidence interval around this average, which calculates upper and lower bounds of that average value. Correspondingly, I am 95% confident that the average weekly audit log hours would fall between 4.8 and 7.8 hours, with 6.3 (the average) as the midpoint.

23. Documentation hours came from audit logs for the original 23, so I left them unchanged in the extrapolations to their peers. As a conservative measure, I assumed that the additional 178 members of the class would have equal or lesser values of Travel Time and No-Show Hours relative to their peers for whom I had data. *See* Table 1.

24. The calculations in rows two through four of Table 1 assume that Travel Time hours and No-Show hours were (roughly) 2/3, 1/3, and 0/3 the values represented by 23 Original Plaintiffs. [fn omitted] In other words, the last row assumes that the new Plaintiffs accrued ONLY documentation time hours of unpaid time.

25. Finally, as another conservative measure, I calculated unpaid wages in rows two through four as if all the hours reductions in Travel Time and No-Shows reduced the unpaid wages at the overtime rate.

*Table 1: Average Weekly Hours and Unpaid Wages*

| | Documentation Hours | Travel Time Hours | No Show Hours | Unpaid Wages (Regular Rate) | Unpaid Wages (Overtime) | Total Unpaid Wages |
|---|---|---|---|---|---|---|
| Average Weekly | 6.3 | 3.2 | 6.4 | $253.73 | $170.97 | $424.70 |
| Average Weekly (2/3 of Travel and No-Show Hours) | 6.3 | 2.0 | 4.0 | $280.44 | $41.08 | $321.52 |
| Average Weekly (1/3 of Travel and No-Show Hours) | 6.3 | 1.0 | 2.0 | $212.04 | $0.00 | $212.04 |
| Average Weekly (ONLY Documentation Hours) | 6.3 | 0.0 | 0.0 | $143.64 | $0.00 | $143.64 |

26. In Table 2, I display the results from my original report in row one, followed by how those results extrapolate to the 178 additional class members in row two. My procedure for extrapolating results had two steps. First, I calculated the total number of weeks worked for each new Plaintiff because I had their effective start and end dates. If Plaintiffs were still under employment for Defendants, I calculated their unpaid accruals up to March 18, 2022. Second, I applied the average unpaid weekly wages to every week they worked.

27. The 23 Original Plaintiffs suffered unpaid wages to the amount of $496,248. The additional 178 class members suffered $5,616,114 in damages. In total, the 201 Plaintiffs suffered $6,112,362.

19

*Table 2: Total Unpaid Wages for Entire Class*

| | Employees | Avg Weeks Worked | Avg Weekly Unpaid Wages | Total Unpaid Wages |
|---|---|---|---|---|
| Class Members from Original Report | 23 | 47.8 | $451.13 | $496,248 |
| Additional Class Members in This Report | 178 | 74.3 | $424.70 | $5,616,114 |
| **Total (All 201 Class Members)** | **201** | - | - | **$6,112,362** |

(*Id*. at PageID#s 7357-7358.)  Finally, Dr. Thompson explained the results when he reduced the Travel Time and No-Show average hours to two-thirds the original representation, one-third the original representation, and zero.  (*Id*. at PageID# 7359.)  When he reduced these hours to two-thirds, the total unpaid wages were $4,747,896.  (*Id*.)  When he reduced them to one-third, the total unpaid wages were $3,300,174.  (*Id*.)  And, lastly, when he reduced them to zero, the total unpaid wages were $2,395,682. (*Id.*)

### B.  Reliability of Dr. Thompson's Testimony

Defendants first argue that Dr. Thompson's "methodology is not proper" because he failed to interview any of the Class Members, did not question any of the Opt-Ins' Declarations, and otherwise failed to conduct a sufficient investigation. (Doc. No. 183 at p. 7.)  Plaintiffs insist that Dr. Thompson used reliable principles and methods and that any objections to his testimony go to the weight of the evidence, not to its admissibility.  (Doc. No. 185 at pp. 6-11.)

To determine whether expert testimony is relevant and reliable requires a "preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Conwood Co., L.P. v. U.S. Tobacco Co*., 290 F.3d 768, 792 (6th Cir. 2002).  *See also Dilts v. United Group Services, LLC*, 500 Fed. Appx. 440, 445 (6th Cir. 2012).  An expert opinion must not rest purely on speculation. *Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 670 (6th Cir. 2010).  However, "Rule 702 does not require

20

an expert to have absolute certainty in formulating his opinion." *Dilts,* 500 Fed. Appx. at 445.  Rather, "experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the 'expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Id*. (quoting *Jahn v. Equine Servs., PSC,* 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Daubert,* 509 U.S. at 592).  "[A]s long as there is a reasonable factual basis for the expert's opinion, any objections to his testimony go to its weight and not its admissibility." *Babcock Power, Inc. v. Kapsalis*, 854 Fed. Appx. 1, 8 (6th Cir. 2021) (citing *In re Scrap Metal,* 527 F.3d at 529-31).  District courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

For the following reasons, the Court finds that Defendants have failed to demonstrate that Dr. Thompson's testimony is inadmissible under Rule 702 and *Daubert.*  Defendants do not argue (or present any evidence) that Dr. Thompson's *methodology* for calculating the 23 Opt-Ins' and/or 178 Rule 23 Class Members' unpaid hours and wages is not scientifically valid.  Rather, Defendants attack the *credibility* of Dr. Thompson's expert testimony by questioning his failure to consider certain factual information regarding the Plaintiffs' individual employment experiences and/or Family Solutions' business operations in making his calculations. For example, with respect to documentation time, Defendants argue that Dr. Thompson's calculations are flawed because he relied solely on the audit logs and failed to talk to the individual class members themselves to determine "what [they] were doing when logged into the computer." (Doc. No. 183 at p. 5.)  Likewise, with respect to travel and no-show time, Defendants attack Dr. Thompson's calculations on the grounds that he failed to interview any of the Opt-Ins to verify their witness statements and failed to consider

21

other variables such as "the offices where the witnesses were based, the tenure of the employees, [or] how employee schedules were set."  (*Id*. at p. 3.)

Defendants' arguments, however, go to the factual sufficiency of Dr. Thompson's analysis and not to the reliability of his underlying methodology.  As the Sixth Circuit has explained, attacks on "'weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility.'" *In re Scrap Metal,* 527 F.3d at 531 (citing *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 801 (6th Cir. 2000) (citations omitted)).  *See also Innovation Ventures, LLC v. Custom Nutrition Laboratories, LLC*, 520 F.Supp.3d 872, 885 (E.D. Mich. 2021).  "[S]o long as the expert witness testimony is not based on speculation, the methodology may be deemed reliable." *Innovation Ventures, LLC*, 520 F.Supp.3d at 887.

As discussed in detail below, the Court finds that Defendants herein have failed to establish that Dr. Thompson's testimony is based on speculation or that his methodology is otherwise not reliable, with respect to any of the three categories of allegedly unpaid work at issue herein.

### 1.     Documentation Time

In calculating the Plaintiffs' unpaid hours relating to documentation time, Dr. Thompson analyzed audit logs and billing sheets, which included data relating to "thousands of employee weeks." (Thompson Depo. (Doc. No. 184-1) at Tr. 24, 49.)  Dr. Thompson explained that the audit logs were particularly relevant to his analysis because they were "a direct indication of [Plaintiffs] doing work for the company.  So they are logging in and then performing something and the system is tracking kind of that recorded effort again with the time stamp throughout the day. So that's time worked and that's why it's relevant to the case." (*Id*. at p. 18-19.)  Indeed, Defendant Smith herself testified in deposition that the Plaintiffs logged into the electronic records system to enter

documentation for a client and that the audit log would track that time.[10]  (Smith Depo. (Doc. No. 114-1) at Tr. 91.)

Dr. Thompson testified that he reviewed the "activity stamps" in the audit log data and calculated the elapsed time between two consecutive activities.  (Thompson Depo. at Tr. 19-22.)  He assumed that the Plaintiffs were performing work for Family Solutions during these intervals.  (*Id.*)  Dr. Thompson did not, however, "count" elapsed time between two "log ins" because he conservatively assumed that the system had logged the Plaintiffs out and that the Plaintiffs were not working in that interval.  (*Id.*)  Using these assumptions, Dr Thompson calculated the average weekly documentation time for each of the 23 Opt-Ins.  After the Rule 23 Class was certified, he then extrapolated the documentation time data relating to the Opt-Ins to the 178 Class Members.  (Doc. No. 183-2 at PageID# 7357.)

The Court finds that Defendants have failed to demonstrate that Dr. Thompson's testimony regarding unpaid hours and wages relating to documentation time is based on "mere speculation." Rather, it is based on data contained in Family Solutions' own audits logs, which Defendant Smith herself admitted "would keep track of" the Plaintiffs' time entering documentation regarding clients. While Defendants question Dr. Thompson's assumption that the Plaintiffs were "actually working" when they were logged into the electronic medical records system and complain that he should have

---

[10] Specifically, Smith was questioned about this issue in deposition as follows:

> Q.    My question was, the time that they spent in ICAN [i.e., Defendants' electronic records system], it would -- in order to enter documentation for a client, they would go into ICAN, right?
> A.    Right.
> Q:    And ICAN, then, would keep track of that the -- the QMHS had entered ICAN in order to do certain things such as enter documentation? ICAN would tell you that that had happened?
> A.    If you pull the audit log, yes.

(*Id.* at Tr. 91.)

undertaken further investigation to confirm what they were doing when logged in, these are issues that can be developed during "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

> ### 2.    Travel Time

The Court likewise concludes that Defendants have failed to show that Dr. Thompson's testimony regarding to travel time is inadmissible under Rule 702.  For this category of time, Dr. Thompson relied principally on the Opt-Ins' witness statements.   These witness statements are Declarations signed by the individual Opt-Ins under penalty of perjury and 28 U.S.C. § 1746.  They each follow the same basic format, an example of which is set forth below:

1.    I am a Plaintiff in the above case against Family Solutions of Ohio ("Family Solutions") and other parties.

2.    Family Solutions did not pay me for all of the hours I was required to work. Family Solutions also did not keep track of that unpaid working time.

3.    I generally was not paid for the time spent traveling from one consecutive client appointment to the next one during the workday. I estimate that 80% percent of the appointments involved travel (as opposed to seeing two consecutive clients at the same home, school, etc.).

4.    I estimate that the average amount of unpaid time spent traveling between consecutive appointments that involved travel was 15 minutes.

(Decl. of Opt-In Anjelica Morris (Doc. No. 153-1 at PageID# 6707-6708)).  Dr. Thompson testified in deposition that he relied on these witness statements because it was the best data available, given Family Solutions' failure to track employee time in these categories and/or produce the Opt-Ins' progress notes.  (Doc. No. 184-1 at Tr. 56.)  He further explained that he believed the estimates contained in these Declarations were the "best estimates" because the Opt-Ins signed them under oath and penalty of perjury.  (*Id*. at Tr. 47-48, 56, 67.)

24

In addition, Dr. Thompson relied on the Opt-Ins' billing sheets, which provided data with respect to the number of patients seen by those Opt-Ins during an "employee week."  (*Id*. at Tr. 53-54.)  *See also* Doc. No. 183-2 at PageID#s 7343-7344.  He computed the average weekly number of patients for the Opt-Ins based on the billing sheets available to him, and then used the Opt-Ins' Declarations regarding the percentage of consecutive appointments that required travel and the average travel time between those appointments.  (Doc. No. 183-2 at PageID# 7344.)  From this data, Dr. Thompson (1) computed the overall average percentage of consecutive appointments that involved travel and the overall average travel time between consecutive appointment; and (2) the average daily patients seen.  (*Id*.)  He then used these averages to compute unpaid travel hours to the Opt-Ins that did not provide Declarations and, later, extrapolated that data to the 178 Class Members.  (*Id*. at PageID#7344-7345.)  *See also* Doc. No. 183-2 at PageID#s 7357-7359.

Defendants argue that Dr. Thompson's testimony is particularly unreliable on this issue because it relies almost entirely on the Opt-Ins' Declarations. Defendants emphasize that Dr. Thompson did not speak to any of the Opt-Ins personally; was not involved in procuring the Declarations; and failed to account for differences in travel time depending on each Plaintiffs' office location, patient base, and/or experience level.  (Doc. No. 183.)  Again, Defendants' arguments do not address the reliability of Dr. Thompson's statistical methodology, but rather the accuracy of the underlying data and the manner in which that data was collected.  The appropriate inquiry, however, is not whether Dr. Thompson's expert reports rely on accurate factual assertions in the Opt-Ins' Declarations.  Indeed, the Sixth Circuit has expressly held that testimony based on allegedly erroneous facts is generally admissible "when there is some support for the facts in the record."  *In re Scrap Metal,* 527 F.3d at 530.  Rather, the inquiry under *Daubert* is whether Dr. Thompson

25

"performed his analysis according to a reliable method . . . and reliably applied that method to the facts of this case." *Id.* at 531.

While Defendants question the data inputted into Dr. Thompson's calculations, they have not questioned the reliability of Dr. Thompson's methodology itself or the reliable application of that method to the facts herein.  Thus, Defendants' concerns "bear on the weight of the evidence rather than on its admissibility" and are better addressed on cross-examination and resolved by the trier of fact.[11] *In re Scrap Metal,* 527 F.3d at 531.

### 3.    No Show Appointments

The same is true with respect to Dr. Thompson's testimony regarding unpaid hours and wages relating to no-show appointments. Here, again, Dr. Thompson relied principally on the Opt-In's Declarations.  Therein, the Opt-Ins estimated the average number of unpaid hours they spent each week "scheduling, traveling to/from, and waiting for now show appointments."  *See, e.g.*, Doc. No. 153-1 at PageID# 6707-670).  Dr. Thompson cross-checked the Plaintiffs' Declarations against the billing sheets and audit logs, explaining that he found a correlation between documentation time and

---

[11] The Court notes that, in Paragraph 23 of a lengthy affidavit attached to Defendants' Motion, Dawn Smith avers that: "[D]ue to COVID-19, Family Solutions of Ohio has significantly limited travel by its employees to Family Solutions of Ohio patients.  Rather, the treatment is oftentimes provided through telehealth.  Due to this change – this continues to this day—one would have expected the expert report to show this change. It does not."  (Smith Decl. (Doc. No. 183-2) at ¶ 23.) Defendants do not mention this issue (or this specific paragraph of Ms. Smith's Declaration) in the Motion itself, nor do they raise any specific legal arguments in their briefing regarding Dr. Thompson's alleged failure to consider the effect of Covid-19 in calculating damages relating to intraday travel.  The Court will not address this issue herein because Defendants failed to properly raise any legal arguments relating thereto in their Motion.  Indeed, it is well-established that it is not the court's function to scour through the record and craft legal issues or arguments on behalf of either party. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) (""[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995)).

no shows.[12]  (Doc. No. 184-1 at Tr. 68.)  He computed the average weekly hours spent dealing with

no-show appointments for the Opt-Ins that submitted Declarations and applied that average to the

Opt-Ins that did not submit Declarations.  (Doc. No. 183-2 at PageID# 7345.)  In his March 2022

Supplemental Report, Dr. Thompson then extrapolated the no-show data from the 23 Opt-Ins to the

178 Rule 23 Class Members.  (Doc. No. 183-2 at PageID#s 7357-7359.)

Defendants have not argued that Dr. Thompson's statistical methodology for computing time

spent dealing with no-show appointments is not scientifically reliable or valid.  Rather, Defendants

again assert that Dr. Thompson's testimony should be excluded because he failed to interview the

Opt-Ins, question any of the information contained in the Declarations, or otherwise account for the

different employment experiences of each individual Class Member.  As discussed at length above,

these are issues that relate to the factual accuracy of the data used by Dr. Thompson--- not to the

reliability of his underlying methodology or the application of that methodology to the facts of the

instant case.  The Court finds that Defendants' arguments go to the weight of the evidence, rather

than its admissibility, and are best addressed through "vigorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof."  *Daubert*, 509 U.S. at 596.

Accordingly, and for all the reasons set forth above, the Court finds that Defendants have

failed to demonstrate either that Dr. Thompson's expert testimony is not the product of reliable

---

[12] Specifically, Dr. Thompson explained: "I have their audit log hours and I have their billing sheets so I know when they are working and when they are not, right. So I'm checking whether, in this case, was there a correlation between documentation time and no shows. And, sure enough, they are positively correlated so if they are pulling these numbers out of the air, I would expect there to not be correlation. But people who had more documentation had more no-show appointments, which leads me to believe that this is an accurate estimate of [the Opt-In Plaintiff's] no show time." (*Id*. at Tr. 68.)

principles and methods, or that Dr. Thompson failed to reliably apply those principles and methods

to the facts of the instant case.[13]

**B.     Whether Dr. Thompson Applied his Own Expertise or Standards**

Defendants next argue that Dr. Thompson's testimony should be excluded because he "did

not apply his own expertise or standards in developing his report and conclusions." (Doc. No. 183 at

p. 7.)   Specifically, Defendants assert that "the categories of damages are based on counsel's

recommendations, not Thompson's review of the evidence and claims." (*Id.*)  Defendants claim that

counsel partially wrote Dr. Thompson's report and, further, that counsel "provided Thompson with

the manner to calculate the three categories of damages." (*Id*.)  Lastly, Defendants complain that Dr.

Thompson failed to "speak with counsel on what information counsel conveyed to the class when

conducting the polls and completing the witness statements." (*Id*.)

Plaintiffs maintain that Dr. Thompson used his own statistical judgment and expertise in

reaching his opinions regarding the unpaid hours and wages in this case.  (Doc. No. 185 at pp. 7-9.)

Plaintiffs further assert that Defendants' contention that counsel provided Dr. Thompson with the

manner to calculate damages is "simply untrue." (*Id*. at p. 9.)

The Court finds Defendants' arguments to be without merit.  As an initial matter, the Court is

not persuaded that Dr. Thompson's expert testimony is inadmissible because Plaintiffs' counsel

identified the three categories of damages in this case.  Dr. Thompson is a damages expert, not a

---

[13] The Court notes that, in her Declaration, Defendant Smith raises a variety of allegations challenging the accuracy of Dr. Thompson's assumptions and calculations.  *See e.g.*, Smith Decl. (Doc. No. 183-2) at ¶¶ 23, 76-79.  Defendants, however, fail to address many of these allegations or raise any specific legal arguments in their briefing with regard thereto.  As noted *supra*, it is not this Court's function to scour through the record and craft legal issues or arguments on behalf of either party.  *See McPherson*, 125 F.3d at 995-996.  Accordingly, the Court will not address any of the specific allegations or issues raised in Smith's Declaration that are not fully addressed and briefed in Defendants' Motion.

liability expert.  It was not Dr. Thompson's function to develop the legal theory of liability in this case or to identify the specific categories of alleged damages.[14]  Rather, Dr. Thompson's role was to calculate unpaid hours and wages with respect to certain areas of allegedly unpaid work.  Defendants have not directed this Court's attention to any authority that it was inappropriate for him to do so under the circumstances presented.

The Court also rejects Defendants' argument that Dr. Thompson did not "develop the manner of calculating damages" in this case.  Defendants do not direct this Court's attention to any persuasive evidence that this is the case.[15]  Moreover, based on this Court's thorough review of Dr. Thompson's expert reports and deposition testimony, it is clear that it was Dr. Thompson that developed the manner of calculating damages in this case.  Indeed, Dr. Thompson testified at length regarding the process he used to calculate damages and the statistical expertise that was required to make those calculations, including extracting data from the audit logs, cross-checking the Opt-Ins' witness statements against the billing records, weighting his average calculations, applying certain conservative assumptions in his calculations, and extrapolating his calculations from the 23 Opt-Ins

---

[14] Indeed, when asked what he did to "verify whether what counsel were telling you were the three categories of damages" in this case, Dr. Thompson testified: "I don't think that's within the scope of my testimony. They reached out to ask that I would calculate if there were any economic damages relating to three activities; documentation time, travel and no shows. That's what I did. I suppose I'm not expert enough in the mental health services to where I could come up with a fourth option there."  (*Id*. at Tr. 94-95.)

[15] The only evidence cited by Defendants in support of this rather serious charge is page 95 of Dr. Thompson's deposition. (Doc. No. 184-1 at Tr. 95.) The Court has carefully reviewed this portion of Dr. Thompson's deposition and finds nothing therein that supports Defendants' assertion that Plaintiffs' counsel "provided Thompson with the manner to calculate the three categories of damages."  (Doc. No. 183 at p. 7.)  Rather, all that Dr. Thompson stated is that counsel identified the three categories of damages for which they wanted him to calculate damages, and that counsel provided him with the audit logs, billing sheets, polling data, and Declarations. (Doc. No. 184-1 at Tr. 95.)  This is in no way the same as telling Dr. Thompson *how* to use these documents and information to calculate damages.

to the larger Rule 23 Class.  Defendants' argument that counsel told Dr. Thompson how to calculate damages in this case is simply unsupported by the record and without merit.

The Court also rejects Defendants' argument that Dr. Thompson's report should be excluded because it was "partially written" by counsel.  During deposition, Dr. Thompson testified as follows:

Q:      [This is your Supplemental Report] dated March 23, 2022. Is this your most recent report?

A:       I believe it is, yes.

Q:      So who drafted this?

A:      It was probably partially me, partially counsel.

Q:      Okay. What part of it would you have drafted?

A:      Well, one, two. I may have drafted all of this. Either way I signed my name to it so the parts that may have been drafted for me was my opinion.

Q:      So we have our supplemental report and you attach it hereto, right?

A:      Right.

Q:      Who drafted this?

A:      Me.

Q:      Okay. All of it?

A:      Yes.

Q:      Who drafted the first report?

A:      Me.

Q:       All of it?

A:      Yes.

(Doc. No. 184-1 at Tr. 126-127.)

30

Rule 26 of the Federal Rules of Civil Procedure states that expert testimony "must be accompanied by a written report—*prepared and signed by the witness*." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). "Nothing in the rule prohibits counsel from helping the witness prepare the report." *Numantics, Inc. v. Balluff, Inc.*, 66 F.Supp.3d 934, 942-943 (E.D. Mich. 2014) (citing Advisory Comm. Notes for Fed. R. Civ. P. Rule 26)("Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed ... this assistance may be needed")).  But that help generally is limited to ensuring that Rule 26's formal requirements are satisfied. *James T. Scatuorchio Racing Stable v. Walmac Stud Mgt., LLC*, 2014 WL 1744848 at *6 (E.D. Ky. Apr. 30, 2014) (explaining that "counsel's assistance is generally limited to helping the expert draft a report in a way that satisfies the requirements of Rule 26").  The Rule does not permit a party to "prepare the report for the witness." *Id.  See also Bekaert Corp. v. City of Dyersburg,* 256 F.R.D. 573, 578 (W.D. Tenn. 2009) (Rule 26 requires an expert to "substantially participate in the preparation of his report.")  As another district court in this Circuit explained, "assistance in the fine-tuning of an expert report in order to ensure compliance with [Rule 26(a)(2)(B)] is permissible, while 'preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it' is not." *Numantics, Inc.*, 66 F.Supp.3d at 942-943 (quoting *In re Jackson Nat. Life Ins. Co. Premium Litigation*, 2000 WL 33654070 at *3 (W.D. Mich. Feb. 8, 2000)).  *See also Mitchell v. Management & Training Corp.*, 2018 WL 4957290 at * 3 (N.D. Ohio March 9, 2018).

Here, the Court is not persuaded, based on the evidence before it, that Dr. Thompson's testimony should be excluded because counsel may have "partially written" his March 2022 Supplemental Report.  As an initial matter, Dr. Thompson's testimony on this point is unclear.  At one point, he states that his Supplemental Report was "probably" drafted partially by him and partially

by counsel, but he then appears to state that he drafted both the March 2022 Supplemental Report and his earlier Reports himself.  He also testifies that the opinions in his Expert Reports are his.  Moreover, even assuming *arguendo* that counsel did partially draft part of Dr. Thompson's Supplemental Report, Defendants have not introduced any evidence that counsel's assistance was improper under Rule 26.  Indeed, as noted above, courts have found that "[n]othing in [Rule 26] prohibits counsel from helping the witness prepare the report," so long as that help is limited to assuring that the report meets the requirements of that Rule.  *Numantics, Inc*., 66 F.Supp.3d at 942-943.  *See also Mitchell*, 2018 WL 4957290 at * 3.  Defendants have not directed this Court's attention to any evidence suggesting that counsel provided assistance beyond assuring that Dr. Thompson's report satisfied the requirements of Rule 26.

Notably, and as discussed above, it is clear to this Court, based on a thorough review of Dr. Thompson's deposition testimony, that he developed the manner of calculating damages in this case. Dr.  Thompson testified at length regarding the materials he reviewed, his analytical process, and the manner in which he calculated average unpaid weekly hours and wages and then extrapolated that data to the Rule 23 Class.  There is nothing in his testimony to suggest that counsel prepared Dr. Thompson's reports "from whole cloth and then ask[ed] [him] to sign" them.  *Numantics, Inc*., 66 F.Supp.3d at 942-943.

Lastly, the Court rejects Defendants' argument that Dr. Thompson's testimony should be excluded because (1) it was counsel that obtained the Declarations from the Opt-Ins; and (2) Dr. Thompson failed to "speak with counsel on what information counsel conveyed to the class when conducting the polls and completing the witness statements."  (Doc. No. 183 at p. 7.)  Defendants cite no authority that having counsel obtain the Opt-Ins' Declarations in this case was improper under the

32

circumstances presented. The Court notes that the Declarations in this case are relatively sparse, each of them conveying straightforward numerical estimates regarding the Opt-Ins' percentage of consecutive appointments involving travel, and amount of time spent traveling between appointments and dealing with no-shows. Defendants have not directed this Court's attention to any evidence or legal authority suggesting that counsel's procurement of Declarations from the Opt-Ins in this case renders Dr. Thompson's expert testimony inadmissible.

In sum, the Court is not persuaded that Dr. Thompson failed to apply his own expertise or standards with regard to his expert opinions in this case. Defendants' argument to the contrary is without merit and denied.

### C. Helpfulness of Dr. Thompson's Testimony

Defendants next argue that Dr. Thompson's testimony should be excluded because it is "very basic math" and, therefore, will not be helpful to the jury. (Doc. No. 183 at p. 8.) Defendants assert that Dr. Thompson did nothing more than calculate averages and then "blindly apply those averages to the Rule 23 class." (*Id*.) Plaintiffs disagree, arguing that Dr. Thompson not only performed averaging calculations but also used his statistical expertise in determining how to interpret data and apply it to large groups. (Doc. No. 185 at p. 7.)

The Court agrees with Plaintiffs. While Dr. Thompson acknowledged that certain elements of his opinions involved relatively basic calculations, he also testified (repeatedly) that his statistical expertise was necessary to evaluate the data and apply it to the larger class. For example, Dr. Thompson explained as follows:

> Q:     Okay. I guess let me ask you this. Why do we need an expert if the plaintiffs are going to say this is how much I worked during the day? What are you bringing to the table as to this category of damages?

A:    So I'm adding these calculations to the other in forming the whole. So some of these calculations, and this is typical in cases, there is a formulaic piece where you are doing A plus B times C, and it's a simple calculation. This is common in a lot of my cases. It's providing an overall estimate of damages for a large group, which is why I believe I was brought in.

Q:    Okay. But on this aspect of it we really don't need a Ph.D. to get attestations handed to them and then calculate the travel time based on these attestations, right?

A:    You don't need a Ph.D. to do the math here, but that's not what is the objective of getting the attestations in the first place.

Q:    Well, what's the objective?

A:    Well, at least my objective was to calculate the economic damages of the class. So it's taking these for the several people and applying math and statistics such that I can identify a reliable estimate of damages for the whole class.

(Doc. No. 184-1 at Tr. 62-63.)  Dr. Thompson further testified:

A:    Yes. So as you have pointed out, some of the math in these economics and statistic reports that I write is very simple, it's very straightforward. You could get a bachelor's degree or potentially less to do a simple addition. It's the expert opinion and the collection of all the data and then putting it all together.  I don't know if you have looked at my code to run this through and to kind of make these calculations. The way that you couch it, it almost sounds like I've got a calculator with six numbers that I'm punching in and then I've got this big number.

The six million [dollars of alleged damages] you see on the screen is based on hundreds of thousands of records from an audit log of time they actually logged into the employer's system. This is real data. And then you say, well, there is 23 and you are extrapolating that and it's a pretty simple calculation. I'm going to have to stand before you in this deposition, and potentially before a jury, and talk to the statistical kind of underpinnings of how that extrapolates out and why I feel comfortable about it. I think that's why they reached out to me. I know that's why they reached out to me. So I feel comfortable with these calculations. I provided sensitivity analyses around these calculations. I have only done sensitivities downward to be conservative and I can stand behind every number in here. I think they wanted an economist to cover all of these bases.

34

(*Id*. at Tr. 159-161.)  Dr. Thompson later provided an example of the statistical expertise that he

applied in extrapolating damages to the class:

> A:      ** There is a little more nuance to applying the average to others. You have a
> question of how it applies. For instance, I have got, perhaps, Ms. Braxton and
> Mr. Dolin worked a different amount of time. So you've got a question of how
> you weight each of their work weeks going forward. So when I'm going to
> extrapolate out, do I weight someone who has 200 work weeks twice as much
> as I would weight someone as if they had 100 work weeks, or would I say,
> okay, these all count as one observation. So whether it's 400 or 200, or
> whatever, each individual plaintiff serves as one so there is a weighting
> consideration in the statistical extrapolation that I needed to consider.
>
> Q:      What is the weight? What did you weight?
>
> A:      So, in that example, so say someone had 200 work weeks under examination,
> and somebody else had 100 work weeks under examination. The average for
> that class was calculated at the work week level. So it was weighted by the
> amount of times we saw them.  When I projected out to the full class, I didn't
> do it that way.  I counted each one as an individual so that someone who
> worked a lot would not be over-represented in the sample, but rather, would
> count as one person, and the next person who worked less time would be
> counted as one person since that was a more accurate representation of
> individuals on the outside.

(*Id*. at Tr. 134-136.)  Moreover, at various times during his deposition, Dr. Thompson explained the

"conservative assumptions" that he used in analyzing the voluminous audit logs in this case, as well

as the "sensitivity analyses" he employed when extrapolating to the Rule 23 Class Members.  (*Id*. at

Tr.  19-21, 28-29, 59-60, 146-147, 160-161.)

In sum, upon careful review of the record, the Court rejects Defendants' argument that Dr.

Thompson's testimony would not be helpful to the jury because it consists of only basic math.  To

the contrary, the Court finds that Dr. Thompson's statistical expertise will be helpful to the jury in

evaluating the data in this case and understanding how it can be used to calculate damages not only for the Opt-Ins, but for the larger Rule 23 Class.[16]

####   D.     Alleged Discovery Abuses

Lastly, Defendants argue (summarily and in a footnote) that, based on Dr. Thompson's testimony, "it is obvious that Plaintiffs hid the ball," i.e., that they could have provided information regarding damages earlier in the litigation but improperly failed to do so.  (Doc. No. 183 at p. 2, fn. 1.)  Defendants argue that "this Court should review Thompson's testimony and revisit the discovery issues raised previously by Defendants."  (*Id*.)  The Court declines to do so.  This Court already considered and rejected Defendants' arguments that Plaintiffs should be sanctioned for failing to timely respond to Defendants' discovery requests regarding damages.  (Doc. No. 172.)  Defendants have not identified any basis to "reconsider" this ruling at this time.  This argument is rejected.

Defendants also complain, in their Reply Brief, that Plaintiffs should not be permitted to argue that Dr. Thompson can rely on representative data in reaching his conclusions because Defendants failed to produce progress notes or other employer records tracking documentation, travel, and/or no-show time.  (Doc. No. 189 at pp. 2-4.)  Defendants complain that Plaintiffs failed to timely raise any issue with Defendants' document production within ten days of the close of discovery as required by Local Rule 37.1[17] and cannot do so now.  (*Id*.)

---

[16] In light of this conclusion, the Court need not address Plaintiffs' alternative argument that, even if he did not qualify as an expert, Dr. Thompson could testify as a summary witness under Fed. R. Evid. 1006.

[17] Local Rule 37.1(b) provides that: "No discovery dispute shall be brought to the attention of the Court, and no motion to compel may be filed, more than ten (10) days after the discovery cut-off date."

Defendants' argument is without merit.  Plaintiffs are not raising a "discovery dispute" or otherwise asking this Court to compel Defendants to produce documents in response to an earlier document request. Thus, the deadline for raising a discovery dispute in Local Rule 37.1 is not applicable or relevant.  Rather, Plaintiffs have raised Defendants' failure to produce progress notes (or other employer records tracking time spent by class members on travel and no-show appointments) in order to show that Dr. Thompson was permitted to rely on the Opt-Ins' Declarations in estimating damages, both for the FLSA Collective Action Members and the Rule 23 Class Members.  Defendants cite no authority that Plaintiffs are somehow prevented from raising this argument because they failed to file a motion to compel during the discovery period.[18]

Accordingly, Defendants' discovery-related arguments are without merit and rejected.

## IV.  Conclusion

Accordingly, and for all the foregoing reasons, Defendants' *Daubert* Motion to Exclude the Testimony of Plaintiffs' Expert (Doc. No. 183) is DENIED.

**IT IS SO ORDERED.**

 

 

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  December 9, 2022              U. S. DISTRICT JUDGE

---

[18] To the extent Defendants are suggesting that Dr. Thompson is not permitted to rely on representative evidence, this argument is rejected.  This Court has already held that "representative evidence may be used in calculating collective and class action damages, particularly where (as here) the defendant employer failed to maintain employee time records." (Doc. No. 143 at p. 22-23.)  Defendants have not sufficiently argued or demonstrated that Dr. Thompson should not be permitted to rely on representative data in the instant action.