## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Jamal Stephenson,** *et al.,*<br>**On behalf of himself and**<br>**All others similarly situated,** | **Case No. 1:18cv2017** |
| **Plaintiffs,** | **JUDGE PAMELA A. BARKER** |
| **-vs-** | |
| **Family Solutions of Ohio, Inc.,**<br>*et al.,* | **MEMORANDUM OPINION AND**<br>**ORDER** |
| **Defendants** | |

Currently pending is Defendants Family Solutions of Ohio, Inc., Prostar Management, Inc., John Hopkins, and Dawn Smith's Motion to Decertify the Class Conditionally Certified under 29 U.S.C. § 216(b).  (Doc. No. 181.)  Plaintiffs filed a Brief in Opposition on June 16, 2022, to which Defendants replied on June 23, 2022.  (Doc. Nos. 186, 191.)  For the following reasons, Defendants' Motion (Doc. Nos. 181) is DENIED.

## I.      Facts

Defendant Family Solutions of Ohio, Inc. ("Family Solutions") is a non-profit organization that provides mental and behavioral healthcare services for children and families throughout Ohio. (Decl. of Dawn Smith dated June 2, 2022 (Doc. 183-2) at ¶¶ 3, 7.)  Defendant Dawn Smith ("Smith") was highly involved in the development of Family Solutions and currently serves as its Vice President of Strategic Planning and Program Management.  (*Id*. at ¶¶ 1, 3.)

During the Class Period, Family Solutions had locations in Cleveland, Bedford Heights, Lorain, Columbus, and Cincinnati.[1]  (*Id*. at ¶ 10.)  At each location, Family Solutions employs a Program Director or Assistant Program Director, as well as a Clinical Supervisor.  (*Id*. at ¶ 11.)  The Program Director/Assistant Program Director and Clinical Supervisor oversee employees based out of that site that work with patients in the field.  (*Id*. at ¶ 12.)  Each site's Clinical Supervisor is the direct supervisor of certain employees based out of that particular site.  (*Id*.)

Qualified Mental Health Specialists[2] ("QMHSs") are one of the categories of employees at Family Solutions that work with patients in the field.  (Decl. of Dawn Smith dated Aug. 31, 2020 (Doc. No. 138-1) at ¶ 7.)  *See also* Deposition of Jamal Stephenson (Doc. No. 115-1) at Tr. 78; Deposition of Melanie Baron (Doc. No. 113-1) at Tr. 18-19.  The parties dispute the precise scope and nature of the QMHSs' job duties.  However, in general terms, the parties agree that QMHSs provide behavioral health services, including counseling services, to Family Solutions' Medicaid-eligible patients.[3]  (Smith Decl. dated Sept. 1, 2020 (Doc. No. 89-1) at ¶¶ 26, 29.)  The parties also

---

[1] According to Defendant Smith, the Cleveland Office is now closed. (*Id*. at ¶ 6.) In addition, although Family Solutions does not have an Akron location, it "has been offering services to patients located in Akron."  (*Id*.)

[2] This position is currently referred to as "Qualified Behavioral Health Specialists."  (Decl. of Dawn Smith dated Aug. 31, 2020 (Doc. No. 138-1) at ¶ 7.)  For purposes of this Opinion, the Court will refer to the position as it was known when it was held by Plaintiffs, i.e., as Qualified Mental Health Specialists.

[3] Defendants assert that QMHSs provide "behavioral health services" and "counseling services," which they claim consist of "office or non-manual" work that involves the "exercise of discretion and independent judgment with respect to matters of significance" including "providing medical care that needs to be documented in the patient's medical files."  (Smith Decl. dated September 1, 2020 (Doc. No. 89-1) at ¶¶ 26, 29, 33-35.)  Plaintiff Stephenson testified that, while employed as a QMHS, he provided important "mental health services," including helping patients deal with mental health crises. (Stephenson Depo. at Tr. 78, 82-83.) Plaintiff Baron testified that she was not permitted to "treat" patients in the medical sense of the word; rather, she "helped [patients] with stuff" like finding a job, managing schoolwork, etc. (Baron Depo. at Tr. 22-24.)  In response to Defendants' Requests for Admissions, Plaintiffs admitted that, as QMHSs, they "performed behavioral health treatment and supportive duties," including Community Psychiatric Supportive Treatment ("CPST") and counseling services.  According to Plaintiffs, "[s]uch work involved a variety of services that complement mental health counseling/therapy. Examples of CPST services include needs assessment, links to community resources, symptom monitoring, education, and help with practicing the skills introduced in counseling sessions."  (Doc. No. 101-1 at PageID#s 2354-2357.)

2

agree that, as part of their duties, QMHSs schedule appointments with clients and visit them at various locations, including in schools and homes.  (Stephenson Depo. at Tr. 78; Baron Depo. at Tr. 18-19.) Because they visit clients in the field, virtually all QMHSs travel between clients during the course of the workday.  (Smith Depo. (Doc. No. 114-1) at Tr. 262-263.)  In addition, it is undisputed that QMHSs are required to create progress notes regarding their clients and enter documentation into their client's files using the "ICANotes" electronic medical record system.  *See* Smith Depo. at Tr. 262-263.

Representative Plaintiffs Melanie Vilk Baron ("Baron") and Jamal Stephenson ("Stephenson") were QMHSs.  (Baron Depo. at Tr. 6; Stephenson Depo. at Tr. 117-125.)  Baron worked in Family Solutions' Cleveland location between August 1, 2016 and October 7, 2016.  (Doc. No. 183-2 at ¶ 60.)  *See also* Baron Depo. at Tr. 5, 12.  According to Defendants, Baron was still in her probationary period at the time she resigned from Family Solutions.  (Doc. No. 183-2 at ¶ 60.) Stephenson worked in Family Solutions' Cincinnati location from August 2016 to May 2017.  (*Id*. at ¶ 56.)

Hourly employees (such as QMHSs) are trained at the site-level by each site's employees. (Doc. No. 183-2 at ¶ 27.)  When first hired, QMHSs attend an orientation session that is conducted by salaried employees at their respective sites.  (*Id.* at ¶ 28.)  Specifically, the site's Program Director or Assistant Program Director and the site's Clinical Supervisor explain time reporting and methods of pay during orientation.  (*Id*.)  In addition, the Program Director, Assistant Program Director, and/or Clinical Supervisor work individually with each employee to provide training regarding how hourly employees are required to report their time.  (*Id.* ¶¶ 31, 32.)  Among other things, employees who are paid hourly are instructed that they must follow Family Solutions' Reporting Time Worked policy,

which provides (in relevant part) that: "Accurate recording of time worked and absence from work is the responsibility of every employee. All employees must complete and sign a time sheet that is signed by their immediate supervisor." (*Id*. at ¶ 29.)

Both Baron and Stephenson confirmed during deposition that, as QMHSs, they were required to submit weekly time sheets.  (Baron Depo. at Tr. 27, 37; Stephenson Depo. at Tr. 143, 145.) Clinical Supervisors then reviewed the QMHSs' time entries for accuracy and compliance with Family Solutions' policies.  (Doc. No. 138-1 at ¶ 32; Doc. No. 183-2 at ¶ 33.)  As part of this review, the time inputted by the QMHS was assigned a code pursuant to Family Solutions' Medicaid fee schedule.  (Doc. No. 89-1 at ¶ 23.)  Family Solutions' fee schedule also includes entries for time spent on non-billable matters.  (*Id.* at ¶ 25.)  *See also* Baron Depo. at Tr. 31-32.

If any changes were needed to the time entries submitted by a QMHS, the Clinical Supervisor would speak with the QMHS and ask him/her to make the required change(s).  (Doc. No. 89-1 at ¶ 24.)  If the QMHS made the change and thereafter submitted his/her time sheet, the QMHS is considered by Family Solutions to have verified the accuracy of the time and billing codes on his/her time sheet.  (*Id.*)  If a QMHS disputed a change requested by a Clinical Supervisor, that issue was escalated, reviewed, and resolved.  (*Id*.)  Otherwise, a QMHS is expected to approve and sign off on his/her time sheets each week.  *See* Stephenson Depo. at Tr. 142-148, 151-152; Baron Depo. at Tr. 38; Doc. No. 183-2 at ¶ 33, 34.

Representative Plaintiffs Baron and Stephenson testified that they were paid for whatever time they put on their time sheets.  *See* Baron Depo. at Tr. 41; Stephenson Depo. at Tr. 148.  Baron and Stephenson testified, however, that QMHSs were not paid for certain categories of time for which there was no corresponding Medicaid billing code.  Specifically, Baron and Stephenson testified that

4

they were not paid for time spent (1) traveling between clients; (2) entering documentation into clients' electronic health records; and (3) dealing with no-show appointments.  *See* Baron Depo. at Tr. 64-65; Stephenson Depo. at Tr. 39, 52-53, 135-137.

Rose Marie Pryor, Julie Winston, Sereena Creamer, and Valerie White (each of whom were employed as Clinical Supervisors at different Family Solutions office locations) submitted Declarations in this action.[4]  (Doc. No. 186-2 at PageID#s 7841-7852.)  Therein, Pryor, Winston, Creamer and White aver that one of their jobs was to evaluate and approve or deny time logged by QMHSs on billing and time sheets.  (*Id*.)  They each state that, throughout their tenures with Family Solutions, "the company had a uniform policy for timekeeping and compensation of . . . hourly QMHSs with respect to time spent writing and reviewing client notes and documentation, on work-related travel, or for waiting and notating files regarding client no-shows."  (*Id*.)  Specifically, Pryor, Winston, Creamer, and White aver that they were each instructed not to approve time logged by QMHSs for any of these activities.  (*Id*.)  In addition, Winston, Creamer, and White state that "[m]any hourly employees at Family Solutions complained to [them] about not getting paid for writing and reviewing client notes and documentation, work-related travel time, and no-shows."  (*Id*.)  Winston, Creamer, and White aver that they discussed these employees' complaints with various Program Directors and Training Coordinators,[5] but nothing was done (to their knowledge) to rectify these complaints.  (*Id.*)

---

[4] Pryor was employed as a Clinical Supervisor in Family Solutions' Cincinnati office.  (Doc. No. 186-2 at PageID# 7841.) Winston states that she was employed as a Clinical Supervisor in Akron. (*Id.* at PageID# 7844.) Creamer was employed as a Clinical Supervisor in both Bedford Heights and Akron.  (*Id.* at PageID# 7847.)  Lastly, White was employed as a Clinical Supervisor in both the Cleveland and Columbus offices.  (*Id*. at PageID# 7850.)

[5] Specifically, Winston, Creamer and White state that they discussed such employee complaints with Cleveland Program Director Tameka Huey-Barkley, Director Erika Thomas, Training Coordinator Cherelle Scott, and/or Program Director Deanna Robinson.  (Doc. No. 186-2 at PageID#s 7841-7852.)

## II.      Relevant Procedural Background

### A.      Initial Pleadings and FLSA Conditional Certification

On September 4, 2018, Plaintiff Alicia Arends filed a Complaint in this Court on behalf of herself and all others similarly situated against Defendants Family Solutions of Ohio, Inc., Prostar Management, Inc., John Hopkins, and Dawn Smith (hereinafter "Defendants").  (Doc. No. 1.) Therein, Plaintiff asserted that she and the putative class members were employed by Defendants as QMHSs and that Defendants had failed to pay them for time worked that was not billable to Medicaid or other health insurance.  (*Id*.)  Plaintiff alleged the following six claims for relief:  (1) violations of the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) (Count One); (2) violations of the Ohio Fair Minimum Wage Amendment ("OFMWA"), Ohio Constitution, Art. II, § 34a (Count Two); (3) violations of Ohio's overtime compensation statute, Ohio Rev. Code § 4111.03 (Count Three); (4) violations of the OFMWA's record-keeping requirement (Count Four); (5) breach of contract (Count Five); and (6) unjust enrichment (Count Six).  (*Id*.)  Plaintiff sought conditional certification as a FLSA collective action; certification of the state law claims under Fed. R. Civ. P. 23; compensatory and punitive damages; and attorney fees and costs.  (*Id.*)  Jamal Stephenson subsequently filed an Opt-In and Consent Form.  (Doc. No. 12-1.)

On February 28, 2019, Plaintiffs filed a Motion for Conditional Certification and Court-Authorized Notice with respect to their FLSA claims.  (Doc. No. 11.)  Therein, Plaintiffs argued that Defendants violated the overtime provisions of the FLSA by failing to pay potential class members for documentation time, intra-day travel between clients, and time spent for client appointments and no-shows.  (*Id.*)  Plaintiffs sought conditional certification with respect to "all hourly employees who

worked as providers for Family Solutions of Ohio during the three years preceding the commencement of this action to the present." (*Id.*)

On September 16, 2019, the Court issued a Memorandum Opinion & Order granting Plaintiffs' Motion for Conditional Certification with respect to all current and former employees who worked as QMHSs between September 16, 2016 and September 16, 2019. (Doc. No. 20.)

### B. Discovery and production of Dr. Thompson's Expert Report

A Case Management Conference ("CMC") was conducted on October 7, 2019, at which time the Court approved the parties' proposed Notice and set deadlines for non-expert discovery, dispositive motions, and expert discovery. (Doc. No. 25.) The docket reflects that FLSA consent forms were filed by twenty-seven (27) Plaintiffs and Opt-Ins. *See* Doc. Nos. 12, 26- 36, 130.

On May 5, 2020, Plaintiffs filed an Amended Class and Collective Action Complaint, designating Plaintiffs Stephenson and Baron as the representative plaintiffs. (Doc. No. 50.) The Amended Complaint raises the same factual and class allegations and asserts the same six grounds for relief set forth in the original Complaint. (*Id.*) Defendants filed an Answer on May 19, 2020. (Doc. No. 51.) Plaintiffs then filed their Motion for Rule 23 Class Certification on July 31, 2020 and Defendants filed Motions for Summary Judgment with respect to all claims asserted by Plaintiffs Baron and Stephenson on September 1, 2020. (Doc. Nos. 70, 88, 89.)

Shortly thereafter, on September 30, 2020, Plaintiffs produced the report of their damages expert, forensic labor economist Shane Thompson, Ph.D. (Doc. No. 183-2 at PageID#s 7341-7350.) Therein, Dr. Thompson concluded that, between September 4, 2015 and September 29, 2019, twenty-

three (23) Opt-Ins[6] accrued a total of 16,965 hours of unpaid work derived from the following three activities: "(1) documentation time in clients' electronic health records, (2) travel time intraday from client to client, and (3) time spent on no-show appointments."  (*Id.* at PageID# 7342.)  Using the hourly rates and unpaid hours specific to each of the 23 Opt-Ins, Dr. Thompson calculated the total value of unpaid wages to be $472,591.00.  (*Id.* at PageID# 7346.)

On October 7, 2020, Dr. Thompson supplemented his Expert Report based on newly submitted information relating to several Opt-Ins.  (*Id.* at PageID#s 7338-7340.)  Therein, Dr. Thompson revised his Opinion to find that the 23 Opt-Ins had a total of 18,055.6 hours of unpaid work derived from these same three activities.  (*Id.*)  Dr. Thompson calculated the total value of unpaid wages for the 23 Opt-Ins to be $496, 248.27.  (*Id.*)

Plaintiffs' counsel produced Dr. Thompson's "expert file" to Defendants on November 23, 2020.  Several months later, Plaintiffs supplemented Dr. Thompson's expert file with fourteen (14) Declarations of certain Opt-Ins.  (Doc. No. 153-1 at PageID#s 6683-6710.)  In these Declarations, the Opt-Ins estimated (1) the percentage of his/her appointments that involved travel; (2) the average amount of unpaid time spent traveling between consecutive appointments; and (3) the average of unpaid hours per week that he/she spent "scheduling, traveling to/from, and waiting for no-show appointments."[7]  (*Id.*)

---

[6] Although the docket indicates a total of twenty-seven (27) Plaintiffs and Opt-Ins in the FLSA Collective Class (*see* Doc. Nos. 12, 26-36, 130), Dr. Thompson's report only calculates damages as to twenty-three (23) of these Plaintiffs.  Plaintiffs do not explain this discrepancy.

[7] Plaintiffs later explained that the information contained in these Declarations was not "new" but, rather, a memorialization in affidavit form of the same information that had previously been provided to Dr. Thompson.

The Court conducted a telephonic status conference with lead counsel on January 8, 2021.  At that time, counsel for Plaintiffs specifically asked the Court not to rule on Plaintiffs' Motion for Rule 23 Certification until after a ruling on the pending summary judgment motions.  Defendants did not object.  *See* Non-Document Order dated January 8, 2021.  In addition, counsel for both parties sought, and the Court granted, an indefinite stay of expert discovery.  *Id.*

## C.  Court Rulings on Summary Judgment and Rule 23 Certification

On March 2, 2021, the Court issued a Memorandum Opinion & Order in which it denied Defendants' Motions for Summary Judgment as to Plaintiff Baron's and Stephenson's FLSA and state law wage-and-hour claims.  (Doc. No. 137.)  Therein, the Court rejected Defendants' argument that they were entitled to judgment in their favor because Plaintiffs are exempt from the overtime provisions of the FLSA and Ohio Revised Code under the "*bona fide* administrative exemption," finding that there was a genuine issue of material issue of fact as to whether Plaintiffs were compensated on a "salary or fee basis."  (*Id.* at pp. 27-33.)

The Court also rejected Defendants' argument that they were entitled to summary judgment in their favor on the issue of damages.  (*Id.* at pp. 35-41.)  The Court first found that Plaintiffs had come forward with sufficient evidence to create a genuine issue of material fact regarding the issue of whether they suffered damages as a result of Defendants' failure to pay for time spent traveling, entering client documentation, and dealing with no-show appointments.  (*Id.*)  With regard to the specific amount of Plaintiffs' damages, the Court found that Plaintiffs had not failed to timely produce estimates and/or evidence of their damages, finding that "[a]ny delay in producing this information appears to be the result, at least in part, of the Defendants' delay in producing Family Solutions' audit logs and progress notes."  (*Id.* at pp. 39-40.)  The Court went on to find that, in light of the fact that

expert discovery had not yet concluded, Defendants' argument that they were entitled to judgment in their favor with respect to the issue of damages was premature.  (*Id*.)  The Court, therefore, denied Defendants' Motion for Summary Judgment with respect to the issue of damages without prejudice subject to refiling after the close of expert discovery.  (*Id*.)

The Court, however, granted summary judgment in Defendants' favor with respect to Plaintiff Baron and Stephenson's state law breach of contract claims, finding that Defendants had come forward with evidence that the parties did not have an employment contract and that Plaintiffs had failed to come forward with contrary evidence or otherwise respond.  (*Id*. at pp. 33-35.)

Subsequently, on April 5, 2021, the Court issued a Memorandum Opinion & Order granting in part and denying in part Plaintiffs' Motion for Rule 23 Certification of a state law class. (Doc. No. 143.)  The Court first denied Plaintiffs' Motion to the extent the putative class included hourly Therapists and a class-based breach of contract claim.[8]  (*Id*. at pp. 13-14.)  Having thus narrowed the state law class, the Court then concluded that "considerations of judicial economy, convenience, and fairness weigh in favor of exercising supplemental jurisdiction over Plaintiffs' [remaining] state law claims."  (*Id*. at p. 23.)  The Court then proceeded to consider certification under Rule 23.  (*Id*. at pp. 26-45.)  The Court reasoned that "the same central legal question is at issue with respect to all members of the putative Rule 23 Class: whether Defendants were required to compensate putative QMHS class members for time spent traveling between clients, dealing with no show appointments, and entering documentation into patient records."  (*Id*.)  The Court rejected Defendants' argument

---

[8] Specifically, with regard to Plaintiffs' breach of contract claim, the Court held that "as the Court recently granted summary judgment in Defendants' favor with regard to Plaintiffs Baron's and Stephenson's individual breach of contract claims (Doc. No. 137), the Court denies Plaintiffs' Motion for Rule 23 Certification to the extent it includes a class-action breach of contract claim." (*Id*. at p. 14.)

that commonality was not satisfied because variability in each QMHSs' patient load, patient base, and experience level would significantly impact the number of hours each individual QMHS spent travelling, entering documentation, and dealing with no shows.  (*Id*.)  With regard to the requirement of superiority, the Court found this requirement satisfied as well, explaining that "common factual and legal issues predominate and are capable of resolution on a class wide basis" and "the wages at issue on the individual class member level are likely to be relatively small, undercutting the individual class members' ability to pursue their own separate actions."  (*Id*. at p. 46.)  The Court granted Plaintiffs' Motion to the extent it sought certification of the following Rule 23 class: "All employees who worked in Ohio as QMHSs for Family Solutions during the period three years preceding the commencement of this action to the present." (*Id*.)

Shortly thereafter, the Court conducted a status conference with counsel, at which time it set case management deadlines relating to the Rule 23 class members, including deadlines for the submission of a joint proposed Notice, completion of representative fact discovery, completion of expert discovery, and submission of motions based on the same.  (Doc. No. 145.)

### D.   Motions for Interlocutory Appeal, Sanctions, and for Discovery of Absent Class Members

On April 19, 2021, Defendants filed a Notice of Interlocutory Appeal to the Sixth Circuit from this Court's Rule 23 Certification decision.  (Doc. No. 147.)  Defendants thereafter filed, in this Court, a Motion for Certification to File Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b).  (Doc. No. 159.) Defendants also filed a Motion for Sanctions, arguing that Plaintiffs' failure to provide evidence of damages and timely supplement expert discovery violated Fed. Rules of Civ. Proc. 26 and 33.  (Doc. No. 153.)  Lastly, on February 4, 2022, Defendants filed a Motion to Compel Discovery of

11

Absent Class Members.  (Doc. No. 174.)  Plaintiffs opposed Defendants' Motions.[9]  (Doc. Nos. 154, 160, 176.)

In a series of Memorandum Opinions & Orders issued in January and February 2022, this Court denied each of Defendants' Motions.  (Doc. Nos. 172, 175, 178.)  The Sixth Circuit Court of Appeals subsequently denied Defendants' Petition for Interlocutory Appeal.  (Doc. No. 188.)  *See also In re Family Solutions of Ohio, Inc.*, 2022 WL 13915151 (6th Cir. June 17, 2022).

### E.    Dr. Thompson's Supplemental Expert Report

The Rule 23 Class consists of 178 Class Members.  On March 23, 2022, Dr. Thompson supplemented his Expert Report to calculate damages for the Rule 23 Class Members with respect to unpaid work derived from documentation time, travel time, and time spent dealing with no-show appointments from September 2015 to March 18, 2022.  (Doc. No. 183-2 at PageID#s 7353-7365.) Extrapolating the data that he had for the 23 Opt-Ins to the 178 Rule 23 Class Members, Dr. Thompson found that the Rule 23 Class members suffered $5,616,114 in damages for unpaid wages relating to these three categories of work.  (*Id*.)  In total, then, Dr. Thompson calculated that the 23 Opt-Ins and 178 Rule 23 Class Members suffered $6,112,362 in damages.  (*Id*.)  Dr. Thompson further opined that, applying certain "conservative reductions" in the amount of hours spent by the 178 Rule 23 Class Members in Travel Time and No-Shows would reduce the total unpaid wages variously to $4,747, 896 (i.e., 2/3 of the original travel/no-show hours); $3,300,174 (i.e., 1/3 of the

---

[9] While Defendants' Motion for Sanctions and Motion for Certification to file Interlocutory Appeal were pending, the parties filed a Joint Motion for Referral to Mediation and to Extend Deadlines.  (Doc. No. 165.)  The Court granted the Motion, referred the matter to Magistrate Judge William Baughman for mediation proceedings, and extended the remaining case management deadlines.  After conducting mediation sessions on November 9, 2021 and December 13, 2021, the Magistrate Judge reported that the parties were unable to reach a resolution.

original travel/no-show hours); and $2,395,682 (i.e., assuming zero unpaid wages due to travel time and no-show appointments).  (*Id*.)

### F.   Motions to Decertify the FLSA and Rule 23 Classes and to Exclude Dr. Thompson's Expert Testimony

On June 2, 2022, Defendants filed Motions to Decertify the FLSA and Rule 23 Classes (Doc. Nos. 181, 182) and to Exclude the Testimony of Dr. Thompson (Doc. No. 183.)  Plaintiffs filed Briefs in Opposition to each of Defendants' Motions, and Defendants thereafter filed Reply Briefs.  (Doc. Nos. 186, 187, 190, 191.)  Several months later, on December 5, 2022, Defendants filed a Notice of Supplemental Authority to Support their Motion for Decertify the Rule 23 Class and Request for Supplemental Briefing.  (Doc. No. 194.)  Plaintiffs have been ordered to file a response by no later than December 16, 2022.

In a separate Opinion & Order issued this date, the Court denied Defendants' Motion to Exclude the Testimony of Dr. Thompson.  (Doc. No. 195.)  The Court addresses Defendants' Motions to Decertify the FLSA Collective Class, below.  Defendants' Motion to Decertify the Rule 23 Class will be addressed in a subsequent Opinion & Order.

## II.   Motion to Decertify the FLSA Collective Action (Doc. No. 181)

### A.   Legal Standard

Under the FLSA, an employer must compensate covered employees "at a rate not less than one and one-half times the regular rate at which he is employed" for work exceeding forty hours per week. 29 U.S.C. § 207(a)(1).  "Congress passed the FLSA with broad remedial intent" to address "unfair method[s] of competition in commerce" that cause "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  *Keller v. Miri Microsystems* LLC, 781 F.3d 799, 806 (6th Cir. 2015); 29 U.S.C.

13

§ 202(a).  As the Sixth Circuit has explained, "[t]he provisions of the statute are 'remedial and humanitarian in purpose,' and 'must not be interpreted or applied in a narrow, grudging manner.'" *Monroe v. FTS USA, LLC*, 860 F.3d 389, 396 (6th Cir. 2017) (quoting *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 585 (6th Cir. 2002)).

To effectuate Congress's remedial purpose, the FLSA authorizes collective actions "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  To participate in FLSA collective actions, "all plaintiffs must signal in writing their affirmative consent to participate in the action."[10] *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).  Only "similarly situated" persons may opt-in to such actions.  *Id*. *See also Frye v. Baptist Memorial Hospital, Inc*., 495 Fed. Appx. 669, 671 (6th Cir. 2012) ("Plaintiffs seeking to file a collective action under the FLSA must demonstrate that they are 'similarly situated.'") (quoting 29 U.S.C. § 216(b)).

Courts generally consider certification of FLSA collective actions in two stages: (1) conditional certification and (2) final certification.  *See Comer*, 454 F.3d at 546; *Frye,* 495 Fed. Appx at 671.  Conditional certification takes place before discovery has commenced, and courts generally ask whether employees are "'similarly situated' for purposes of the statute's requirements." *Comer*, 454 F.3d at 546.  At the conditional certification stage, courts employ a "fairly lenient standard, [that] typically results in conditional certification of a representative class."  *Id*. at 547.  *See also Thompson*

---

[10] "Unlike class actions under Fed. R. Civ. P. 23, collective actions under the FLSA require putative class members to opt into the class. *See* 29 U.S.C. § 216(b) ('No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.'). These opt-in employees are party plaintiffs, unlike absent class members in a Rule 23 class action. *See* 7B Wright, Miller, & Kane, Federal Practice and Procedure § 1807 at 474 n. 13 (3d ed. 2005)." *O'Brien v. Ed Donnelly Enterprises, Inc*., 575 F.3d 567, 583 (6th Cir. 2009) *abrogated on other grounds by Campbell-Ewald Co. v. Gomez,* 577 U.S. 153 (2016).

14

*v. Bruister and Associates, Inc.,* 967 F.Supp.2d 1204, 1212 (M.D. Tenn. 2013) (quoting *White v. Baptist Memorial Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012)). At the final certification stage, courts apply a "stricter standard" because it occurs after extensive discovery following the addition of the opt-ins to the collective action. *Monroe*, 860 F.3d at 397. *See also Comer*, 454 F.3d at 547 ("At the second stage, following discovery, trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated.") At this stage, "Plaintiffs generally must produce 'more than just allegations and affidavits' demonstrating similarity in order to achieve final certification." *Frye*, 495 Fed. Appx at 671 (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)). Indeed, "[c]ourts have recognized that 'the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Id.* (quoting *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)).

Although the FLSA does not provide a definition of what it means for plaintiffs to be similarly situated, courts in the Sixth Circuit look to three "non-exhaustive" factors to determine whether members of the collective action are similarly situated: (1) the "factual and employment settings of the individual[ ] plaintiffs;"(2) "the different defenses to which the plaintiffs may be subject on an individual basis;" and (3) "the degree of fairness and procedural impact of certifying the action as a collective action." *Monroe*, 860 F.3d at 397 (quoting *O'Brien*, 575 F.3d at 584). *See also Pierce v. Wyndham Vacation Resorts, Inc.,* 922 F.3d 741, 745 (6th Cir. 2019). Plaintiffs are similarly situated if they can demonstrate that they suffered from "a single, FLSA-violating policy" instituted by the employer defendant, or if their "claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Monroe,*

15

860 F.3d at 398 (quoting *O'Brien*, 575 F.3d at 584–85). "'Where Defendants have demonstrated a formal policy to comply with the law and compensate employees for all time worked, Plaintiffs may satisfy their burden by producing substantial evidence of a *de facto* policy of circumventing the law.'" *Fenley v. Wood Group Mustang, Inc.*, 325 F.R.D. 232, 242 (S.D. Ohio 2018) (quoting *Cornell v. WorldWide Bus. Servs. Corp.*, 2015 WL 6662919 at *3 (S.D. Ohio Nov. 2, 2015)). *See also Kutzback v. LMS Intellibound, LLC*, 301 F.Supp.3d 807, 817 (W.D. Tenn. 2018).

The lead plaintiff bears the burden of demonstrating that the opt-ins are similarly situated. *See O'Brien,* 575 F.3d at 584; *Frye,* 495 Fed. Appx at 672. The plaintiff's burden to prove that the members of the collective are similarly situated is less stringent than the plaintiff's required showing of predominance under Federal Rule of Civil Procedure 23(b). *Monroe*, 860 F.3d at 397. *See also O'Brien,* 575 F.3d at 584 ("Under the FLSA, opt-in plaintiffs only need to be 'similarly situated.' While Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA."); *Lockhart v. D&S Residential Services, LP*, 2020 WL 4717910 at * 4 (W.D. Tenn. Aug. 13, 2020).

**B.    Analysis**

Defendants argue that the FLSA conditional class should be decertified for several reasons. (Doc. No. 181.) First, Defendants maintain that Plaintiffs cannot show that they are similarly situated to the Opt-Ins because "discovery has confirmed that the evidence is highly individualized" with respect to each Opt-Ins' "alleged hours worked, but not paid," as well as Defendants' actual or constructive notice of the same. (*Id*. at pp. 8-9.) Second, Defendants assert that they will rely upon individualized defenses, including questioning each Opt-In regarding their time sheets; their training regarding whether they were permitted to report time spent on documentation, intra-day travel, and

16

no-show appointments; and their respective patient visits, patient loads, and travel schedules.  (*Id.* at pp. 13-16.)  Third, Defendants maintain that "judicial fairness dictates decertification" because, if this matter proceeds as a class action, they will need to call all of the Opt-Ins, resulting in "twenty-three separate mini-trials."  (*Id.* at pp. 17-18.)  And, lastly, Defendants argue that decertification is warranted because, with only 23 members, the FLSA conditional class is "not sufficiently numerous." (*Id.* at p. 12.)

In response, Plaintiffs argue substantial evidence demonstrates that the lead Plaintiffs and the Opt-Ins are similarly situated.  (Doc. No. 186 at pp. 4-7.)  Plaintiffs maintain that they share a common theory of liability with the Opt-Ins (i.e., that Defendants improperly failed to pay them for intraday travel, documentation time, and no-shows) and that this is sufficient to defeat decertification under Sixth Circuit precedent.  (*Id.*)  Plaintiffs further assert that, even if there are differences among the individual Opt-ins regarding their travel schedules and patient loads, any such differences would only affect the amount of each Opt-Ins' damages, which is not a basis for decertification. (*Id.* at pp. 8-10.) Lastly, Plaintiffs argue that Defendants have failed to identify any individual defenses that would defeat certification and, further, that fairness and procedural efficiency dictates that this matter proceed as a collective action.  (*Id.* at pp. 11-13.)

The Court will address the parties' arguments in the context of the three factors set forth in *O'Brien, supra*, below.

### 1.      Factual and Employment Settings of the Individual Plaintiffs

The first factor, the factual and employment settings of the Plaintiffs and Opt-Ins, considers, "to the extent they are relevant to the case, the plaintiffs' job duties, geographic locations, employer supervision, and compensation." *Monroe*, 860 F.3d at 401.  *See also Fenley*, 325 F.R.D. at 243;

17

*Kutzback*, 301 F.Supp.3d at 817.  For the following reasons, the Court finds that this factor weighs against decertification.

Here, the FLSA Collective class is limited to QMHSs, all of whom perform the same job duties.[11]  Notably, Plaintiffs have introduced substantial evidence that, regardless of which Family Services location they work in, QMHSs' job duties include intra-day work travel and writing and reviewing client documentation.  *See* Smith Depo. at Tr. 262-263; Stephenson Depo. at Tr. 39, 52-53, 78, 78; Baron Depo. at Tr. 18-19, 64-65; Opt-In Declarations (Doc. No. 186-3); Pryor, Winston, Creamer, White Declarations (hereinafter "Supervisor Declarations") (Doc. No. 186-2 at PageID#s 7841-7852.)).   Plaintiffs have also introduced substantial evidence that QMHSs regularly experience no-show appointments.  *See* Supervisor Declarations (Doc. No. 186-2 at PageID#s 7841-7852); Opt-In Declarations (Doc. No. 186-3).  Further, the record contains evidence (and it does not appear to be disputed) that, regardless of office location, all QMHSs were subject to the same timekeeping policy, required to submit weekly time sheets, and compensated based on their time sheets.  (Smith Decl.

---

[11] Defendants attach a lengthy Declaration from Defendant Smith to their Motion, in which she avers (among other things) that Opt-Ins Alexander Dolin, Carolyn Cates, Olga Diaz, and Cocaina Hereford never held the QMHS position for Family Solutions.  (Decl. of Dawn Smith (Doc. No. 181-2) at ¶¶ 63-64.)  Defendants also state that Opt-In Dawn Glaze was a QMHS but never worked past her training period and, therefore, "never worked with patients and never faced the hours worked, but not paid, issues that the rest of the prospective class allegedly faced."  (*Id*. at ¶ 64.)  Defendants do not mention these Opt-Ins (or these specific paragraphs of Ms. Smith's Declaration) in the Motion itself, nor do they raise any specific legal argument regarding these Opt-Ins in their briefing.  Perhaps as a result, Plaintiffs do not address Ms. Smith's allegations regarding these specific Opt-Ins in their Brief in Opposition. The Court likewise will not address the allegations raised in Paragraphs 63 and 64 of Ms. Smith's Declaration because Defendants failed to properly raise any legal issues relating to those specific allegations.  Indeed, it is well-established that it is not the court's function to scour through the record and craft legal issues or arguments on behalf of either party. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995)).  Thus, the Court will not address the issue of whether Opt-Ins Dolin, Cates, Diaz, and Hereford are (or are not) QMHSs nor will the Court address any legal issues specific to Ms. Glaze in this decision.

18

(Doc. No. 181-2) at ¶ 29, 34; Smith. Depo. at pp. 259-260, 262-263; Supervisor Declarations (Doc. No. 186-2 at PageID#s 7841-7852).)

Most importantly, Plaintiffs have come forward with substantial evidence to support their contention that Family Solutions had a company-wide practice of failing to pay QMHSs for time spent in intra-day travel, entering client documentation, and dealing with no-show appointments. This evidence includes the following. Plaintiffs Stephenson and Baron both testified in deposition that they were not paid for time spent (1) traveling between clients; (2) entering documentation into clients' electronic health records; and (3) dealing with no-show appointments.  (Baron Depo. (Doc. No. 113-1) at Tr. 64-65; Stephenson Depo. (Doc. No. 115-1) at Tr. 39, 52-53, 135-137).  *See also* Stephenson Decl. (Doc. No. 186-3 at PageID#s 7857-7858) at ¶ 5.  In addition, thirteen of the Opt-Ins[12] submitted sworn Declarations stating that they were generally not paid by Family Solutions for time spent in these same three categories.  *See* Opt-In Declarations (Doc. No. 186-3) at ¶ 5.  Further, former Clinical Supervisors Pryor, Winston, Creamer, and White submitted Declarations in which they each aver that Family Solutions had "a uniform policy for timekeeping and compensation of . . . hourly QMHSs with respect to time spent writing and reviewing client notes and documentation, on work-related travel, or for waiting and notating files regarding client no-shows." (Doc. No. 186-2 at PageID#s 7841-7852.)  As noted *supra,* Pryor, Winston, Creamer, and White aver that they were each instructed not to approve time logged by QMHSs for any of these activities.  (*Id*.)  Notably, Pryor, Winston, Creamer, and White worked at Family Solutions' different office locations in Bedford Heights, Cleveland, Columbus, and Cincinnati, as well as in Akron.  (*Id*.)

---

[12] The following Opt-ins submitted Declarations: (1) Alex Dolin; (2) Anjelica Morris; (3) A'Ishah Braxton; (4) Natalia Varias; (5) Allen Steele; (6) Sharon Burns; (7) Maria Graciani; (8) Dawn Wood; (9) Latwana Wright; (10) Christina Harris; (11) Andrea Reynolds; (12) Alexandra Toth; and (13) Carolyn Cates.  (*Id*.)

19

Finally, and notably, Defendant Dawn Smith (who is Family Solutions' Vice President of Strategic Planning and Program Management and served as Family Solutions' 30(b)(6) representative) herself testified in deposition that Family Solutions had a company-wide policy of not paying QMHSs for time spent travelling between clients, as follows:

> Q.    The question to you is [when you joined Family Solutions in 2013] was it already in place that QMHSs would not be paid for travel time?
>
> A.    Yes.
>
> Q.    That was already -- that their hours spent while driving would not be compensated, that was already a policy in place at Family Solutions when you came in 2013?
>
> A.    Yes.
>
> Q.    And when you learned of that policy, how did you learn? By reading something, a written policy, a written document, or by speaking to someone?
>
> A.    Just speaking, trying to learn the company I had become a part of.
>
> Q.    Okay.  So somebody told you, We don't pay QMHSs for driving from one client to another?
>
> A.    Yes.
>
> Q.    Who told you that?
>
> A.    At that time, it would have been the CEO and CFO.
>
> Q.    Who were [they] at that time?
>
> A.    [Defendants] John Hopkins and Nancy Hopkins.

(Depo. of Dawn Smith (Doc. No. 114-1) at Tr. 64-65.)

Based on the above, the Court is satisfied that Plaintiffs are similarly situated because they have met their burden of showing that their claims are unified by common theories of defendants' statutory violations, i.e., that Defendants violated the FLSA by implementing a company-wide

20

practice of failing to pay QMHSs for time spent on intra-day travel, documentation, and no-show appointments.  *See Monroe*, 860 F.3d at 402-403 (finding plaintiffs were similarly situated because their "claims were unified by common theories:  that FTS executives implemented a single, company-wide time-shaving policy to force all technicians. . . to underreport overtime hours worked on their timesheets");*O'Brien*, 575 F.3d at 585 (finding plaintiffs were similarly situated because they "articulated two common means by which they were allegedly cheated" and, thus, their claims were "unified by a common theory").

Defendants' arguments to the contrary are without merit.  Although Defendants do not directly address this particular *O'Brien* factor, Defendants appear to maintain that Plaintiffs are not similarly situated because "the QMHS position is unique and different for each employee."  (Doc. No. 191 at p. 6.)  Specifically, Defendants assert that each QMHSs' employment experience is "highly individualized" based on a variety of factors, including the office location where the QMHS worked; the specific training provided to each QMHS regarding timekeeping; the nature of each QMHSs' patient base and patient load; each QMHSs' travel schedule; and each QMHSs' individual "documentation habits."  (Doc. No. 181 at pp. 6-10; Smith Decl. (Doc. No. 181-2) at ¶¶ 35-54.) Because of these disparities, Defendants assert that the evidence is highly individualized with respect to both the alleged hours worked but not paid for each of the Plaintiffs, as well as Defendants' actual or constructive knowledge of the same.  (Doc. No. 181 at p. 3.)

This argument is rejected. The Sixth Circuit does not require plaintiffs to be "identically situated" to proceed collectively under the FLSA. *See Monroe*, 860 F.3d at 402 ("Two governing principles from our case law serve as guides: plaintiffs do not have to be identically situated to be similarly situated, and the FLSA is a remedial statute that should be broadly construed."); *Thompson*,

967 F.Supp.2d at 1220 ("On the issue of liability, Section 216(b) requires that the employees be 'substantially similar,' not identical; 'even at the decertification stage, similarly situated does not mean identically situated.'") (quoting *Wilks v. Pep Boys*, 2006 WL 2821700 at *3 (M.D. Tenn. Sept. 26, 2006)). Indeed, "[p]arties would be hard pressed to identify an example in which employees participating in a collective action were subjected to identical circumstances." *Noel v. Metropolitan Gov't of Nashville & Davidson County, Tennessee*, 2015 WL 3650376 at * 5 (M.D. Tenn. June 11, 2015). *See also Thompson*, 967 F. Supp. 2d at 1220 ("Rare would be the collective action—or class action for that matter—where the employees labored under the exact same circumstances.")  Rather, plaintiffs are similarly situated when their claims are unified by common theories of defendants' statutory violations, "even if the proofs of these theories are inevitably individualized and distinct." *O'Brien*, 575 F.3d at 584-585.

Here, although Plaintiffs and the Opt-Ins (hereinafter referred to collectively as "Plaintiffs") may have been trained by different supervisors and had varying travel schedules and patient loads, these differences do not overcome the fact that Plaintiffs were all QMHSs who were performing the same types of work and subject to the same pay practices allegedly in violation of the FLSA. Plaintiffs' claims are thus unified by a common theory: that Family Solutions implemented a single, company-wide policy of not paying for time spent on travel, client documentation, and no-show appointments.  And, as discussed above, Plaintiffs have come forward with substantial evidence supporting this contention.  Under Sixth Circuit precedent, this is sufficient to demonstrate that the Plaintiffs are similarly situated.  *See Pierce*, 922 F.3d at 746 ("As in *Monroe* the employees' essential claim is that Wyndham required them to work off the clock and altered their recorded hours in an effort to avoid paying overtime.  And as in *Monroe*, that amounts to a single policy.")

The Court also rejects Defendants' argument that decertification is warranted because, due to their varying travel schedules and patient loads, etc., Plaintiffs will each have different numbers of alleged hours worked, but not paid.  "To meet their burden under the [FLSA,] the employees must show that they 'performed work for which [they were] improperly compensated.'"  *Pierce,* 922 F.3d at 747 (quoting *Anderson v. Mt Clemens Pottery Co*., 328 U.S. 680, 687 (1946)).  However, the Court finds that variability in the amount of unpaid work for each of the Plaintiffs does not defeat certification in the instant case.  As another court in this District recently explained, "courts regularly allow representative testimony about the number of hours worked in FLSA collective actions." *Callaway v. DenOne LLC*, 2019 WL 2610660 at * 3 (N.D. Ohio June 26, 2019).  Moreover, here, Plaintiffs intend to introduce the expert testimony of Dr. Thompson, who relies, in part, on representative evidence to arrive at calculations regarding each Plaintiff's number of hours worked but not paid (as well as each Plaintiff's damages).[13]  (Doc. No. 181-2.)

To the extent Defendants argue that decertification is warranted because Plaintiffs will have "highly individualized" damages due to their varying trial schedules and patient loads, the Court likewise finds this argument to be without merit.  "The fact that calculating damages would require individualized factual showings . . . is not determinative of whether Plaintiffs are similarly situated because 'individualized damages determinations must be made in virtually every FLSA case involving multiple plaintiffs.'"  *Cornell*, 2015 WL 6662919 at * 2. *See also Thompson*, 967 F.Supp.2d at 1215; *Martinez v. First Class Interiors of Naples, Inc*., 2022 WL 1462965 at * 12 (M.D. Tenn. May 6, 2022) (denying decertification and finding that differences relating to compensation were

---

[13] In a separate Opinion & Order issued this date, this Court rejected Defendants' efforts to exclude Dr. Thompson's testimony.  (Doc. No. 195.)

"more relevant to an ultimate damages calculation (should damages prove warranted) than to a decertification decision").  Moreover, as noted above, Plaintiffs intend to rely on the expert testimony of Dr. Thompson regarding damages, both with respect to the FLSA Collective Action and the Rule 23 Class members.  (Doc. No. 181-2 at PageID#s 7129-7156.)

Lastly, the Court rejects Defendants' argument that decertification is warranted because named Plaintiffs Stephenson and Baron "present individualized issues." (Doc. No. 181 at pp. 10-11.) Defendants maintain that, during the last weeks of his employment, Stephenson failed to timely submit billing sheets, which Defendants assert is a violation of both Ohio law and Family Solutions' policies.  (*Id.*)  With regard to Baron, Defendants argue that Baron was still in her probationary period when she resigned from Family Solutions and that she had "admitted issues with accurately recording and submitting her time."  (*Id.*)  While not entirely clear, Defendants thus appear to argue that the named Plaintiffs are not similarly situated to the Opt-Ins due to these individual issues with the named Plaintiffs' job performance.

Defendants' argument is without merit.  Despite Stephenson's and Baron's alleged failures to properly and/or timely submit time sheets, the fact remains that (like the Opt-Ins) Stephenson and Baron held the position of QMHS; performed the same job duties; were subject to the same alleged company-wide policy of failing to pay for intraday travel, documentation and no-show appointments; and claim that they were not paid for these three categories of time.  The alleged "individual issues" identified by Defendants with regard to Baron and Stephenson do not affect these core similarities and, thus, are not sufficiently significant to rise to the level of defeating certification.

In sum, the Court finds that Plaintiffs have sufficiently demonstrated a common theory of one or more FLSA violations and, further, that any differences among the Plaintiffs' factual and

employment settings do not outweigh the similarities discussed above.  Accordingly, the Court concludes that the first *O'Brien* factor weighs against decertification.

### 2. Existence of Individualized Defenses

The second factor considers the different defenses to which the plaintiffs may be subject on an individual basis. *Monroe*, 860 F.3d at 404.  Several circuits, including the Sixth Circuit, hold that "individualized defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation." *Monroe*, 860 F.3d at 404.  *See O'Brien*, 575 F.3d at 584–85 (holding that employees are similarly situated if they have "claims ... unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct"); *Creely v. ManorCare, Inc*. 920 F.Supp.2d 846, 856 (N.D. Ohio 2013) (""Where plaintiffs' factual and employment settings are similar, these defenses do not necessarily render collective treatment unmanageable.") (quotation omitted). *See also Morgan*, 551 F.3d at 1263. However, where plaintiffs have disparate factual and employment settings, "defenses likely will be individualized, rendering collective treatment inappropriate." *Creely*, 920 F.Supp.2d at 856.

Here, Defendants raise (summarily and without citation to authority) a host of allegedly individualized defenses which they claim defeat certification.  (Doc. No. 181 at pp. 16-17.)  For the following reasons, the Court finds that none of these defenses (either individually or collectively) warrant decertification.

Defendants first argue that "the[ir] primary defense … is that the proposed class members held exempt status positions," i.e., that they are subject to the administrative exemption set forth in 29 U.S.C. § 213(a)(1).  (Doc. No. 181 at p. 16.)  As explained in Defendants' Motions for Summary Judgment (Doc. Nos. 88, 89), Defendants' assertion is that all QMHSs are exempt from the FLSA

overtime provision because (1) QMHSs are paid on a fee basis; (2) QMHSs' primary duty is the performance of non-manual work that directly relates to Family Solutions' general business operations; and (3) QMHSs' primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  (Doc. Nos. 88, 89.)  Defendants state that they will raise this defense at trial, but do not explain how it constitutes an "individualized defense" or cite any authority supporting the proposition that decertification is warranted where an employer argues that a collective class of employees are exempt from the FLSA's overtime provisions.

The Court is not convinced that Defendants' administrative exemption defense is an "individualized defense" that will render collective adjudication of Plaintiffs' claims unworkable.  As discussed above, the FLSA Collective Class is limited to QMHSs, all of whom perform the same job duties and are subject to the same timekeeping and compensation policies.  The applicability of the administrative exemption defense is not individual to any particular Plaintiff but, rather, is a single defense that applies to *all* Plaintiffs by virtue of the fact that they all hold the position of QMHS. *See Martinez*, 2022 WL 1462965 at * 15 (finding this factor weighed against decertification where "MRD has not pointed to different defenses to which particular (but not all) Plaintiffs may be subject; instead, MRD points to one defense to which MRD contends all Plaintiffs are subject.")  As such, the Court finds that this defense is uniform as to all Plaintiffs and suitable for resolution in a collective forum.

Defendants next argue that they will "defend this case based on the timecards," noting that "each plaintiff is faced with timecards that they drafted, reviewed, and ultimately approved." (Doc. No. 181 at p. 16.)  Defendants argue that "each class member will need to testify to their discussions with their clinical supervisor and the reasons why the employee did not object, did not challenge the policy, and never created any documentation of" Defendants' alleged failure to pay for intraday

26

travel, documentation time, and no-show appointments. (*Id.*) Although not entirely clear, Defendants' argument appears to be premised on Family Solutions' Reporting Time Worked Policy, which requires employees to accurately record their time and then verify the number of hours worked by completing and signing a time sheet that is signed by their immediate supervisor.  (Doc. No. 183-2 at ¶ 29.)

"Where Defendants have demonstrated a formal policy to comply with the law and compensate employees for all time worked, Plaintiffs may satisfy their burden by producing substantial evidence of a *de facto* policy of circumventing the law." *Cornell*, 2015 WL 6662919 at *3.  *See also Fenley,* 325 F.R.D. at 242 (same); *White v. Baptist Memorial Health Care Corp*., 2011 WL 1883959 at * 9 (W.D. Tenn. May 17, 2011) ("Where an employer's formal policy is to compensate employees for all time worked, courts have generally required a showing that the employer's 'common or uniform practice was to not follow its formal, written policy.'") (quoting *Pacheco v. Boar's Head Provisions Co., Inc.,* 671 F.Supp.2d 957, 962 (W.D. Mich. 2009)).  Here, Plaintiffs have come forward with substantial evidence that Family Solutions had a common, *de facto* policy of not paying QMHSs for time spent on intraday travel, entering client documentation, or dealing with no-show appointments. As discussed above, this evidence includes (1) Defendant Smith's deposition testimony that Family Solutions had a company-wide policy of not paying QMHSs for travel time; (2) the Declarations of former Clinical Supervisors Pryor, Creamer, Winston, and White that they were instructed not to approve time logged by QMHSs for travel, documentation, or no-show appointment time; (3) the thirteen Opt-In Declarations that they were not paid for time spent in these three categories; and (4) the deposition testimony of named Plaintiffs Stephenson and Baron that they were not paid for time spent in these three categories.  *See* Smith Depo. at Tr. 64-65;

Supervisor Declarations (Doc. No. 186-2 at PageID#s 7841-7852); Opt-In Declarations (Doc. No. 186-3); Baron Depo. at Tr. 64-65; Stephenson Depo. at Tr. 39, 52-53, 135-137.

Moreover, Plaintiffs have come forward with substantial evidence that Plaintiffs complained about Family Solutions' alleged failure to pay for the three categories of time at issue. Specifically, former Clinical Supervisors Winston, Creamer and White each averred that "[m]any hourly employees at Family Solutions of Ohio complained about not getting paid for writing and reviewing client notes and documentation, work-related travel time, and no-shows." (Doc. 186-2 at PageID# 7845, 7848, 7851.) These Supervisors averred that the employees' complaints were variously discussed with Cleveland Program Director Tameka Huey-Barkley, Director Erika Thomas, Training Coordinator Cherelle Scott, and/or Program Director Deanna Robinson, but not resolved. (*Id*.)

In light of the above, the Court is not persuaded that Defendants' "timecard" defense is highly individualized or otherwise could not be addressed in a collective forum. Defendants are certainly "free to present evidence of [their] lawful employment policies and practices, to cross-examine individual representative plaintiffs, and to call to the stand others with material testimony that helps the defendant's case." *Wilks,* 2006 WL 2821700 at *7. *See also Crawford v. Lexington-Fayette Urban County Government*, 2008 WL 2885230 at * 11 (E.D. Ky. July 22, 2008). However, Defendants' ability to do so does not translate into a finding that this matter is not amenable to a collective resolution. *See, e.g., Jordan v. IBP, Inc.*, 542 F.Supp.2d 790, 813–14 (M.D. Tenn. 2008) ("The defenses here are amenable to collective resolution in that the defendants will have ample opportunity to demonstrate that they do not employ a policy or practice which has the effect of denying plaintiffs compensation to which they are entitled under the FLSA and may cross-examine the representative

28

plaintiffs and adduce other testimony that supports their position."); *Crawford*, 2008 WL 2885230 at * 11 (same).

Lastly, Defendants summarily argue as follows: "[T]he alleged hours worked, but not paid will be highly contested.  The no show hours were paid by Family Solutions.  The travel time is highly individualized and will be contested heavily by Family Solutions.  Finally, and most importantly, the expert's calculation of the alleged medical documentation is flawed and should be rejected."  (Doc. No. 181 at p. 16-17.)

These arguments are not persuasive.  "The question is not whether Defendants have defenses to liability, but whether these defenses can be 'adequately presented in a collective forum.'" *Callaway*, 2019 WL 2610660 at * 3 (quoting *Monroe*, 860 F.3d at 406).  Here, and as discussed *supra*, Defendants' arguments regarding the number of hours that each Plaintiff worked and whether or not Family Solutions paid for time spent dealing with no-show appointments can be addressed collectively.  *See Pierce*, 922 F.3d at 746 (noting that "individual defenses regarding the number of hours that testifying employees worked" can be addressed collectively); *Kutzback*, 301 F.Supp.3d at 821-822 (rejecting defendants' argument that "it would be impossible to collectively defend . . . the overtime each individual Plaintiff was actually under paid; how many Plaintiffs knew and/or reported that they were working off the clock; and as such placed on notice of the alleged FLSA violations").

Further, the Court rejects Defendants' argument that decertification is warranted because Dr. Thompson's "calculation of the alleged medical documentation is flawed."  (Doc. No. 181 at p. 17.) As an initial matter, Defendants filed a Motion to Exclude Dr. Thompson's Expert Testimony, which this Court denied in a separate Memorandum Opinion & Order issued this date.  (Doc. No. 195.) Moreover, this argument relates to damages calculations, which this Court has found is not a basis

for decertification herein.  *See also Cornell*, 2015 WL 6662919 at * 2; *Thompson*, 967 F.Supp.2d at 1215; *Martinez*, 2022 WL 1462965 at * 12.  Additionally, the Court could consider bifurcating the liability and damages phases of the instant case, if the issue is timely raised.  *See, e.g., Noel*, 2015 WL 3650376 at * 6 (denying decertification and noting that, "as the case has already been bifurcated, the question of liability as it applies to the entire FLSA class can be examined independent of subsequent inquiries regarding damages and the impact on individual plaintiffs."); *Wilks*, 2006 WL 2821700 at * 7 (denying decertification but noting that "the court will consider bifurcation of the case into a liability stage, where the parties could address the alleged existence of an impermissible policy or practice, and a damages one, where they could, if necessary, debate the impact of that policy or practice on individual plaintiffs."); *Thompson*, 967 F.Supp.2d at 1222 (denying decertification and noting that "many fairness and due process concerns can be addressed through trial management, such as the bifurcation of liability and damages").

Accordingly, because a collective action would allow Defendants adequate opportunity to defend themselves against Plaintiffs' FLSA claims, the Court finds that the second *O'Brien* factor weighs against decertification.

### 3.    Degree of Fairness and Procedural Impact

The third, and final, factor is whether continuing to proceed collectively is fair, procedurally manageable, and in accord with the "broadly remedial and humanitarian" purposes of the FLSA. *Creely*, 920 F.Supp.2d at 857.  Thus, when evaluating this factor, courts consider whether continuing the collective action comports with "the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical." *Monroe*, 860 F.3d at 405.  However, "the remedial

nature of the FLSA, standing alone, does not justify allowing a case to proceed collectively." *Cornell*, 2015 WL 6662919 at *4 (quoting *Crawford*, 2008 WL 2885230 at *11).  Courts must "balance the cost alleviation enjoyed by individual plaintiffs and any increase in judicial efficiency against the potential harm to defendants and any potential judicial inefficiency." *Id.*  Because it is a remedial statute, the FLSA must not "'be interpreted or applied in a narrow, grudging manner.'" *Creely*, 920 F.Supp.2d at 857 (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 144 (6th Cir.1977)).

The Court finds that this factor weighs against decertification.  As discussed at length above, Plaintiffs have come forward with substantial evidence that Family Solutions implemented a company-wide policy of not paying QMHSs for time spent on intraday travel, documentation time, or no-show appointments.  In light of this common thread unifying the Plaintiffs' claims, the Court finds that decertification would be contrary to the primary objectives of § 216(b) and an inefficient use of judicial resources.  Specifically, if this action were decertified, each individual Plaintiff would be "place[d] back at square one without the benefit of pooled resources," which is contrary to the remedial policy underlying the FLSA.  *See Crawford*, 2008 WL 2885230 at * 12.  *See also Monroe*, 860 F.3d at 405 ("This case satisfies the policy behind FLSA collective actions and Congress' remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical.") (citing *Hoffman-LaRouche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)); *Callaway*, 2019 WL 2610660 at * 4 ("In enacting the FLSA's collective-action mechanism, Congress intended to facilitate the consolidation of small-value claims that would be impractical to pursue on an individual basis. Pursuing this case as a collective action furthers this congressional policy and thus favors class treatment.").

31

Moreover, decertification would be an inefficient use of judicial resources.  If this matter does not proceed as a collective action, each individual Plaintiff would have to file a separate lawsuit, requiring this Court to address as many as 23 separate cases. While Defendants suggest that 23 "short and simple trials" would, in fact, be "the best means to resolve this lawsuit" (Doc. No. 191 at p. 5), the Court disagrees.  To the contrary, and as another district court in this Circuit aptly observed, "[t]he investment of time and resources required for this many separate trials would render adjudication of Plaintiffs' claims so unwieldy and expensive as to substantially hinder, if not preclude, their resolution by judicial means." *Thompson*, 967 F.Supp.2d at 1222 (quoting *Monroe v. FTS USA, LLC*, 763 F.Supp.2d 979, 996 (W.D. Tenn. 2011)).

Defendants nonetheless argue that this factor weighs in favor of decertification because they intend to call "the vast majority of the FLSA Class" to testify at trial, effectively resulting in 23 separate "mini-trials."  (Doc. No. 181 at pp. 17-18.)  Defendants also suggest that they will need to call each of the Plaintiffs' various supervisors, "mak[ing] this case much more [like] twenty-three individual trials rather than a class."  (Doc. No. 191 at p. 3-4.)

This argument is without merit.  The alleged necessity of "mini-trials" does not necessarily justify decertification.  *See Cornell*, 2015 WL 6662919 at 5; *White*, 2011 WL 1883959 at * 14.  As discussed, Plaintiffs and the Opt-Ins are similarly situated and there are many common issues that are capable of collective resolution.  That Defendants may choose to call all twenty-three Opt-Ins and their respective supervisors to testify does not change this core finding. Moreover, because decertification would result in the filing of 23 separate lawsuits (which the Court has explained would require a substantial investment of judicial time and resources), Defendants have not convincingly explained how decertification would result in a more efficient use of judicial resources.

32

As both the Supreme Court and Sixth Circuit have observed, "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact." *Hoffman-LaRoche, Inc.,* 493 U.S. at 170.  *See also Monroe*, 860 F.3d at 405.  Because the Plaintiffs and Opt-Ins have come forward with substantial evidence that Defendants improperly implemented a company-wide policy of failing to pay QMHSs for the three categories of time at issue herein, the Court finds that considerations of fairness and procedural impact weigh against decertification.[14]

## III.   Conclusion

In conclusion, the Court finds that each of the three *O'Brien* factors weigh against decertification of the FLSA Collective Action.  Accordingly, and for all the foregoing reasons, Defendants' Motion to Decertify the Class Conditionally Certified under 29 U.S.C. § 216(b) (Doc. No. 181) is DENIED.

**IT IS SO ORDERED.**


    *s/Pamela A. Barker*

    PAMELA A. BARKER

Date:  December 9, 2022    U. S. DISTRICT JUDGE

---

[14] Defendants' related argument that decertification is warranted because "twenty-three class members is not sufficiently numerous" is without merit and denied.  (Doc. No. 181 at p. 12.)  The cases cited by Defendants in support of this argument involve Rule 23 Class Actions, not FLSA Collective Actions.  The Sixth Circuit has expressly held, however, that the stricter requirements for Rule 23 Class Actions (i.e., numerosity, typicality, commonality, adequacy of representation, predominance, and superiority) do **not** apply to FLSA collective actions.  *See O'Brien*, 575 F.3d at 584 ("Under the FLSA, opt-in plaintiffs only need to be 'similarly situated.' While Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA."); *Monroe*, 860 F.3d at 397.  *See also Campbell v. Middle Kentucky Community Action Partnership, Inc.,* 540 F.Supp.3d 717, fn 6 (E.D. Ky. 2021) ("Defendant's proposed numerosity requirement is misplaced. In an FLSA § 216(b) collective action, 'the requirements of Rule 23 do not apply and no showing of numerosity, commonality, typicality and adequacy of representation need to be made.'") (quoting *Vengurlekar v. Silverline Tech., Ltd.,* 220 F.R.D. 222, 229 (S.D.N.Y. 2003)); *Smith v. Lowe's Companies, Inc.,* 2005 WL 6742234 at * 2 (W.D. Tenn. Aug. 13, 2020) ("The strict requirements of Rule 23 of the Federal Rules of Civil Procedure do not apply to FLSA collective actions. Thus, no showing of numerosity, typicality, commonality or representativeness is required.") (internal citations omitted).